## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ALI EL-KHALIL, D.P.M.,

        Plaintiff,                    Case No.

v.

ANTHONY TEDESCHI, MOHAMMED KHALIL, NSIMA USEN,
MAHMUD ZAMLUT, LEONARD ELLISON
And THE DETROIT MEDICAL CENTER,
A Domestic Not for Profit Corporation, jointly and severally

        Defendants.

---

BEN M. GONEK (P43716)
Law Offices of Ben M. Gonek, PLLC
Attorney for Plaintiff
500 Griswold, Suite 2450
Detroit, Michigan 48226
ben@goneklaw.com

---

### FIRST AMENDED COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, ALI EL-KHALIL, by and through his attorneys,

LAW OFFICES OF BEN M. GONEK, PLLC and hereby complains of all the

named Defendants, as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff Dr. Ali El-Khalil, (hereinafter referred to as "Plaintiff" or "Dr. El Khalil"), is a current resident of Dearborn Heights, Michigan.

2.      Plaintiff is a podiatrist licensed to practice podiatry in the State of Michigan and had full privileges at Defendant The Detroit Medical Center since 2008, until recently.

3.      Defendant Anthony Tedeschi is a licensed Medical Doctor who is the Chief Executive Officer for the The Detroit Medical Center.

4.      Defendant Mohamed Khalil is a podiatrist licensed practice to podiatry in the State of Michigan as is a resident of the City of Dearborn Heights, Wayne County, Michigan.  Defendant Khalil also has staff privileges at Defendant The Detroit Medical Center.

5.      Defendant Nsima Usen is a podiatrist licensed practice to podiatry in the State of Michigan as is a resident of the City of Dearborn Heights, Wayne County, Michigan.  Defendant Usen also has staff privileges at Defendant The Detroit Medical Center.

6.      Defendant Mahmud Zamlut is physician licensed to practice medicine in the State of Michigan and is a resident of West Bloomfield Township, Oakland County, Michigan.  Dr. Zamlut also has staff privileges at Defendant Detroit Medical Center.

7.      Defendant Leonard Ellison is a physician licensed to practice medicine in the State of Michigan and upon information and belief is a resident of Oakland County, Michigan.  Dr. Ellison also has staff privileges at Defendant The Detroit Medical Center.

8.      Defendant The Detroit Medical Center (hereinafter referred to as "DMC" or "Defendant DMC") is a domestic Non Profit Corporation operating out of Detroit, Michigan in the county of Wayne.

9.      The court has subject-matter jurisdiction in this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2601 et seq and 29 U.S.C. § 794(a).  This Court also has pendent jurisdiction over the state law claims.

10.     Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b), as it is in the district in which Defendants conduct business.

11.     Plaintiff brings this retaliation action on her own behalf under the False Claims Act, 31 U.S.C. § 3729 et seq.     This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).   This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1331.

12.     Plaintiff  Dr. El-Khalil, D.P.M., reported to Defendant The Detroit Medical Center various health care fraud wherein all the Defendants were violating the False Claims Act.  Plaintiff also reported to the Defendants that he reported their health care fraud which violated the False Claims Act to the Government.

Shortly, thereafter Plaintiff's staff privileges were not renewed in retaliation by Defendants.  Plaintiff has never had any malpractice suits or state related disciplinary actions by any Governmental agency lodged against him and his hospital privileges should have been renewed.

## INTRODUCTION

13.    Plaintiff obtained staff privileges at Defendant The Detroit Medical Center in 2008.  Staff Privileges need to be renewed every two years.

14.    From 2008 until the present time, Plaintiff has never had any type of malpractice complaint filed against him nor has he ever had any type of patient complaint while having staff privileges at the Detroit Medical Center. Additionally, Plaintiff has not had any LARA investigations or administrative complaints by any state agency.

15.    In addition to having staff privileges at Defendant The Detroit Medical Center, Plaintiff has staff privileges at Henry Ford Wyandotte and Garden City Hospital.

16.    Plaintiff has never had any complaints lodged against him at either Henry Ford Hospital Wyandotte and/or Garden City Hospital.

17.    Up until 2015, Plaintiff had staff privileges at Beaumont Dearborn f/k/a Oakwood Dearborn.  Plaintiff's privileges were not renewed after he reported various staff members for committing health care fraud.  Since his privileges were

not renewed at Beaumont Dearborn, a number of the individuals Plaintiff made complaints against have lost their privileges at Beaumont Dearborn, have had their enrollment in certain insurance companies terminated, and/or have been sued civilly by Automobile insurance companies for RICO due to their fraudulent activities that Plaintiff had previously reported.

18.     Back in 2015/2016 when Plaintiff sought to renew his privileges, Plaintiff informed Defendant The Detroit Medical Center that his privileges were not renewed at Beaumont Dearborn because he reported various providers to the Federal Government for violating the False Claims Act.

19.     Plaintiff's privileges were renewed in 2015/2016 by the Defendant The Detroit Medical Center despite being advised that Plaintiff's privileges were not renewed at Beaumont Dearborn.

20.     Since Plaintiff's privileges were renewed by Defendant The Detroit Medical Center in 2015/2016, Plaintiff has reported suspected heath care fraud to federal authorities that involve the payment of Medicare monies to the perpetrators of said suspected fraud.  The perpetrators of the suspected health care fraud are the Defendants in this case, associates of the Defendants, and others.

21.     The Defendants learned that Plaintiff reported the suspected health care fraud involving Medicare monies to Federal authorities and specifically

threatened Plaintiff that he would be sorry for doing such.  These threats were made on several occasions.

22.    During mid-January of 2018, Plaintiff learned that his privileges were suspended, and he subsequently learned that his privileges would not be renewed.

23.    Plaintiff's privileges at the Defendant the Detroit Medical Center were not renewed in retaliation for Plaintiff reporting the suspected health care fraud perpetrated by all of the Defendants.  The actions of all the Defendant was with malice and done in bad faith.  Defendants actions were in violation of the anti-retaliation provision of the False Claims Act.

24.    Plaintiff is also seeking damages against the individual Defendants for tortuously interfering with his business relationship with physicians that consult him.

25.    Plaintiff is seeking monetary damages and will be seeking declaratory/injunctive relief as well.

## FACTUAL SPECIFIC ALLEGATIONS

26.    In 2015/2016 when Plaintiff's privileges were not renewed at the Beaumont campuses, Plaintiff began admitting more patients and treating more patients at the Defendant The Detroit Medical Center.

27.     While treating patients at Defendant The Detroit Medical Center,

Plaintiff observed health care fraud being perpetrated by other health care

providers including Defendant The Detroit Medical Center.

28.     The individuals perpetrating health care fraud which included

submitting claims to Medicare for what would be characterized as false claims are

individual Defendants Mohammed Khalil, Nsima Usen, Mahmud Zamlut,  and

Leonard Ellison and the corporate Defendant The Detroit Medical Center.

29.     The specific fraud as outlined below was reported by Plaintiff to both

Defendant Tedeschi, the Administration of the The Detroit Medical Center, and the

Federal Government.

## HEALTH CARE FRAUD PERPETRATED BY
## DEFENDANTS KHALIL AND USEN

30.     As stated above, Defendants Mohammed Khalil and Nsima Usen are

podiatrists licensed to practice podiatry in the State of Michigan.

31.     Both Defendants Khalil and Usen have had privileges at Defendant

The Detroit Medical Center since 2008.  At all times relevant to this First

Amended Complaint, both Defendants Khalil and Usen were acting as agents for

Defendant The Detroit Medical Center.

32.     Upon information and belief, several years ago Defendant The Detroit

Medical Center discovered that both Defendants Khalil and Usen were performing

unnecessary medical procedures which included performed procedures which were done in an incompetent manner.

33.     Upon information and belief, after discovering this, Defendant The Detroit Medical Center required that Defendants Khalil and Usen get permission from the Head of Orthopedics, Dr. Juib Suiemann, before performing any procedures.

34.     Several years ago after Dr. Suiemann stopped practicing at Defendant The Detroit Medical Center, Defendants Khalil and Usen were no longer required to seek approval by any Department leaders regarding procedures performed at the Defendant The Detroit Medical Center.

35.     Thereafter Defendants Khalil and Usen began engaging in providing unnecessary medical procedures and once again performing procedures in a incompetent manner placing patients at risk.

36.     Defendants Khalil and Usen were and continue to bill Medicare for these unnecessary medical procedures in violation of the False Claims Act.

37.     Vangjo Cobani, DPM is a licensed podiatrist, having graduated from podiatry school, but did not complete his residency.

38.     As such, he is not an authorized provider for any insurance company or the Government.

39.     Defendants Khalil and Usen hired Cobani as a stand-in, to see patients in their stead so they could bill for Cobani's work under their respective NPI's.

40.     From approximately 2010 through 2017, Cobani went to nursing homes, saw patients, and "billed" as Khalil or Usen, under Khalil's or Usen's NPI.

41.     Defendants Khalil and Usen, who did not see the patients in question, pocketed 70% of the billings generated in this fashion and paid Cobani 30%.

42.     Many of the patients, if not most, seen by Cobani under this arrangement were demented, obtunded or both and didn't know who Cobani really was.

43.     Cobani, to avoid detection by nursing home administrators, would round early in the morning or late at night, dictate his note and leave.

44.     Defendants Khalil and Usen did not supervise Cobani in any sense. They billed for his work under false pretenses.

45.     Defendants Khalil and Usen billed under their NPI's for work done by Cobani, knowing the bills were false while the Government did not.

46.    Defendants Khalil and Usen also performed many unneeded medical procedures on patients using their associate Defendant Tameka Taylor.

47.    In the next paragraphs, Plaintiff has outlined examples of unnecessary surgeries and medical procedures performed by Defendants Usen and Khalil as well as their associate Tameka Taylor in which Medicare was fraudulent billed for unneeded services.

I.    **PATIENT A**

   a. Patient A is a 46 year old female with uncontrolled diabetes and associated vascular disease. Like many uncontrolled diabetics she has inappropriate blood supply to her feet, exposing her to the risk of infection, abscess, fractures, tissue death and amputation.

   b. Defendants began treating Patient A in April, 2015. A general surgeon had operated on her right great toe on March 26, 2015.

   c. Unsurprisingly given her pre-existing condition, Patient A's right great toe did not heal normally after the surgery.

   d. On April 2, 2015, Usen took Patient A to surgery. It was to be the first of many billing events for Defendants involving Patient A. Usen billed for "Incision and Drainage of Right Great Toe

Abscess." He also claims to have performed a bone biopsy, and billed for it.

e. Usen began a long series of predictably fruitless (for Patient A) but economically fruitful (for Defendants) surgeries on Patient A's feet.

f. Khalil, Usen and Nasser performed at least twelve additional surgeries on Patient A's feet, and billed for them, between April 8, 2015 and November 6, 2017.

g. In addition, Khalil, Usen, Nasser and Taylor saw Patient A in their office, in hospitals, and in nursing homes on a near daily basis, billing continually.

h. A review of the billing records reveals that Defendants routinely billed for a level of treatment that is not documented in the medical chart of Patient A. Minor suturing became deep debridement. Routine washings became delayed primary closure. This enabled defendants to upcode to a more lucrative CPT designation.

i. Over time, Patient A's feet gradually were removed, piece by piece, instead of with the obviously needed earlier amputation. The piecemeal removal of foot parts over time enriched Defendants, who could not perform an amputation, above or below the knee, as podiatrists.

j.  Eventually Patient A was classified as having a Stage One charcot foot, meaning the bones in the foot were softening due to diabetes and associated insufficient blood supply.

k.  Nailing a Stage One charcot foot together with hardware is contraindicated but Defendants did anyway. Not only could they bill for inserting the hardware, they could later bill for removing it.

l.  By November, 2017 Patient A had lost most of both feet and still had not received the obviously needed amputations. Once the feet are amputated the podiatrist's billing opportunity is gone.

## II.  PATIENT B

a.  Patient B is a 65-year old male who, although a poor historian, appears to have diabetes, osteomyelitis, past deep venous thrombosis resulting in placement of a vena cava filter, alcohol abuse and chronic extremity pain. He had a right transmetatarsal amputation and later a left hallux (great toe) amputation. He was prone to develop additional blood clots and was being medically managed on blood thinners.

b.  Defendants were consulted to follow Patient B's podiatric care. In doing so they display visible effort to max out billing by timing their respective interventions to steer around "global periods"

during which the original provider is expected to perform routine follow up without additional charge.

c. To illustrate, Taylor amputated the left hallux on 12-3-15.

d. The next day, 12-4-15, Usen and not Taylor followed up on the floor providing routine post-operative care that Taylor would have been expected to provide without charge. Usen could pretend this was a new patient for him and bill, which he did.

e. Usen also billed for routine follow up on 12-5 and 12-6, since Taylor could not without running afoul of the global period. See CPT 13160, which states the post-op global period is 90 days.

f. On 12-7-15, it was decided the patient needed another surgical procedure, this time a debridement. Since Taylor could not fully bill for it so soon after her surgery, Usen performed the surgery and billed for it as if new.

g. The next day, 12-8-15, Taylor came to the floor and performed a routine follow up check. She billed for it, because it was Usen's surgery, not hers. She could pretend she was "new."

h. On 12-14-15 Khalil performed a podiatric consultation as if the patient was a stranger to him. If Taylor or Usen had done the same thing it would have been free. See CPT Codes 99222 and 99223.

i.  On 12-15-15 Taylor saw the patient and billed as a "modifier." The global period should have required her to perform this service without charge. To label her service a "modifier" implied falsely that the service was unrelated to the original surgery.

j.  On 12-22-15 Khalil, not Taylor or Usen, saw the patient because Taylor and Usen wouldn't have been paid. Each had operated on Patient B within 90 days.

k.  On 1-5-16 Usen fraudulently billed for a follow up visit falsely labeling it a "modifier," that is, not related to the earlier service for which the 90 day global period had not expired.

l.  On 1-19-16 Usen again fraudulently billed for services provided to Patient B as a supposed "modifier" when use of that designation was false and fraudulent.

m. Patient B was readmitted to the DMC Sinai-Grace Hospital on 2-16-16. Khalil and Usen have a contract to operate a foot pain clinic there.

n.  On 2-18-16 Khalil billed for a progress note, because Taylor and Usen were still within their respective global periods.

o.  On 2-19-16 Usen billed. To get around the global period he claimed falsely to be entitled to "modifier" status.

p.  On 3-2-16 Taylor saw Patient B in the pain clinic, because the global period had expired. The same pattern then repeated itself.

q.  Beginning in 3-9-16 Defendants Khalil and Usen had the patient transported from his nursing home to the pain clinic so they could bill for weekly visits. They could have provided the same level of care safely, and with less expense and discomfort to Patient B, at the nursing home.

r.  Khalil and Usen have a contract with DMC Sinai-Grace to operate the pain clinic there, and Khalil and Usen were motivated to generate lucrative facility fees for DMC when such were unnecessary. Patient B could have been seen at his nursing home.

s.  On 3-31-16 Patient B was transported to DMC Sinai-Grace for a Doppler study. This is a type of ultrasound, a dimensional study to assess for DVT. Patient B was already receiving blood thinners and had a vena cava filter to snare any blood clots inclined to embolize into the heart. DMC would receive a lucrative facility fee for this Doppler study.

t.  On 4-28-16 Khalil amputated the left second toe.

u.  On 4-29-16 Usen, naturally not Khalil, saw Patient B in follow up and billed when Khalil could not have.

v.  Review of Patient B's medical records through November, 2017
reveals the same repeating pattern of Khalil, Usen, Taylor and,
beginning in 2017 Nasser, timing their visits based on who could
get paid and who couldn't.

w.  Nasser first saw Patient B on 9-23-17. Nasser, as a new physician
with no history with the patients of the practice, was a more
lucrative billing asset since he had fewer global periods to contend
with.

48.    In addition to the unneeded medical procedures as outlined above,
Drs. Usen and Khalil received many unneeded referrals from Defendant Dr.
Zamlut, who was also perpetrating medical fraud.

49.    Dr. Zamlut is an employee of Team Health.  During Plaintiff's
tenure at The Detroit Medical Center, Plaintiff was advised that Dr. Zamlut was
upcoding and provided unnecessary referrals to both Dr. Khalil and Usen.

50.    Plaintiff learned that Dr. Zamlut was upcoding and billing at higher
level visits the patients he saw on a daily basis at The Detroit medical Center.

51.    In fact an examination of Dr. Zamlut's billings submitted to
Medicare reflected that he would be working in excess of 24 hours a day.

16

52.     Plaintiff also learned that Dr. Zamlut also ordered unnecessary consultations by both Defendants Usen and Khalil on a substantial number of the patients he treated.

53.     In addition to the fraudulent billings, and unnecessary consultations perpetrated by Defendant Zamlut, Plaintiff learned that Defendant Zamlut was causing his employer to contribute large sums of money to Defendant Ellison in exchange for consultations from Defendant Ellison that involved Medicare patients and were nothing more than illegal kickbacks.

54.     Plaintiff also learned that Nachelle Lester who works at Defendant The Detroit Medical Center was soliciting gifts and monies in exchange for specialists receiving consultations from Dr. Ellison.

55.     Upon information and belief Nachelle Lester was instrumental in orchestrating consults on behalf Defendant Ellison for other health care providers who gave her gifts and monies.  Upon information and belief a number of these consults were unnecessary and were for patients covered by Medicare.

56.     When Plaintiff learned this information, he reported it to the Administration at The Detroit Medical Center and to the Federal Government.

57.     Defendants subsequently learned that Plaintiff reported this fraudulent conduct to both the Administration at The Detroit Medical Center.

17

58.     Plaintiff sought to renew his privileges at Defendant The Detroit Medical Center during the spring of 2017.

59.     Plaintiff was informed his privileges were renewed.

60.     Thereafter, all the Defendants conspired to have Plaintiff's privileges terminated by non renewal at the Defendant The Detroit Medical Center by orchestrating false complaints against him.  The conspiracy was in retaliation for Plaintiff's protected activity of reporting the fraudulent activities of the Defendants to both the Defendant The Detroit Medical Center and the Federal Government.

61.     Without any notice in mid-January of 2018, Plaintiff's privileges at Defendant The Detroit Medical Center were revoked/not renewed.

62.     This adverse action taken by Defendant The Detroit Medical Center was in retaliation for Plaintiff reporting the violations of the False Claims Act by the individual Defendants and others associated with the Defendant The Detroit Medical Center, as well as the Defendant The Detroit Medical Center.

63.     Plaintiff realleges and incorporates the previous paragraphs by reference.

## COUNT ONE
### VIOLATON OF THE RETALIATION PROVISION OF THE FALSE CLAIMS ACT

64.     The retaliation provision of the False Claims Act protects an

employee, associated other, and/ or contractor from being "discharged, demoted,

suspended, threatened, harassed, or in any other manner discriminated against in

the terms and conditions of employment because of lawful acts done by the

employee, contractor, agent or associated others in furtherance of an action under

this section or other efforts to stop 1 or more violations of this subchapter." 31

U.S.C. § 3730(h).

65.     Relief for violating this section includes reinstatement of the

employee, contractor, or agent with the same level of seniority that person would

have had but for the discriminatory conduct, as well as double damages for back

pay, interest on back pay, and special damages. Relief also includes reasonable

attorneys' fees. *Id.* §3730(h)(1)(b).

66.     Plaintiff's hospital privileges were terminated and/or not renewed due

to his reporting to the Federal Government and the Defendant The Detroit Medical

Center the violations of the False Claims Act by the Defendants and others

associated with Defendant The Detroit Medical Center.  Such conduct violates 31

U.S.C. § 3730(h).

67.     As a direct and proximate cause of Defendants' illegal conduct, i.e.

conspiring to orchestrate and orchestrating the termination/non-renewal of

Plaintiff's hospital privileges at the Defendant The Detroit Medical Center,

Plaintiff sustained damages to his reputation, earning ability, as well as humiliation and embarrassment.

68.    As a direct and proximate cause of Defendants illegal actions, Plaintiff sustained damages.  Plaintiff is entitled to damages in excess of $75,000 for Defendants unlawful conduct.

WHEREFORE Plaintiff respectfully requests that this Court enter Judgment in his favor and any other relief he may be entitled to for an amount in excess of $75,000.00.

## COUNT TWO
## VIOLATON OF THE RETALIATION PROVISION
## OF THE FALSE CLAIMS ACT (CONSPIRACY)

69.    The retaliation provision of the False Claims Act protects an employee, associated other, and/ or contractor from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).

70.    Relief for violating this section includes reinstatement of the employee, contractor, or agent with the same level of seniority that person would

have had but for the discriminatory conduct, as well as double damages for back pay, interest on back pay, and special damages. Relief also includes reasonable attorneys' fees. *Id.* §3730(h)(1)(b).

71.     Plaintiff's hospital privileges were terminated and/or not renewed due to his reporting the violations of the False Claims Act by all the Defendants and others associated with Defendant The Detroit Medical Center.

72.     As described above, all the Defendants conspired to violate the False Claims Act 31 U.S.C. § 3730(h) by making false complaints against Plaintiff and then causing the MEC to terminate or not renew Plaintiff's privileges .

73.     As a direct and proximate cause of Defendants illegal actions, Plaintiff sustained damages.  Plaintiff is entitled to damages in excess of $75,000 for Defendants unlawful conduct.

WHEREFORE Plaintiff respectfully requests that this Court enter Judgment in his favor and any other relief he may be entitled to for an amount in excess of $75,000.00.

## COUNT THREE
## TORTIOUSLY INTERFERING WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP

74.     Plaintiff had the benefit of receiving many professional consultations from physicians with privileges at the Defendant The Detroit Medical Center.

75.     The individual Defendants and the Defendant The Detroit Medical Center orchestrating false complaints against him and by illegally failing to renew his privileges, all the Defendants tortuously interfered with a business relationship that Plaintiff had with a number of referring physicians.

74.     As a direct and proximate cause of Defendants illegal actions, Plaintiff sustained damages.  Plaintiff is entitled to damages in excess of $75,000 for Defendants unlawful conduct.

WHEREFORE Plaintiff respectfully requests that this Court enter Judgment in his favor and any other relief he may be entitled to for an amount in excess of $75,000.00

## JURY DEMAND

Plaintiff demands a jury trial.

Respectfully submitted,

/s/ Ben Gonek
BEN M. GONEK (P43716)
LAW OFFICES OF BEN GONEK PLLC
500 Griswold Street, Suite 2450
Detroit, MI 48226
(313) 963-3377

Dated: November 27, 2018

22