## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ALI EL-KHALIL, D.P.M.,

        Plaintiff,

v.

ANTHONY TEDESCHI, MOHAMMED
KHALIL, NSIMA USEN, MAHMUD
ZAMLUT, LEONARD ELLISON and
THE DETROIT MEDICAL CENTER,
A Domestic Not for Profit Corporation,

        Defendants.

_____/

Case No.  2:18-cv-12759-MAG-APP

Hon. Mark A. Goldsmith
Mag. Judge Anthony P. Patti

## THE DETROIT MEDICAL CENTER'S RESPONSE IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Roger P. Meyers, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts).  I also certify that it is the appropriate length.  Local Rule 7.1(d)(3).

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

COUNTER-STATEMENT OF FACTS ..............................................................1

LEGAL STANDARD..........................................................................................5

ARGUMENT .......................................................................................................6

A. The Health Care Quality Improvement Act of 1986 requires DMC to report its final decision here................................................................................7

B. Dr. El-Khalil provides no authority showing that this Court may enjoin DMC from making a mandatory report under HCQIA. ................................................9

C. Even if the Court disregarded Dr. El-Khalil's failure to discuss the controlling legal framework, he still would fail to show entitlement to an injunction here…….........................................................................................11

    1. Dr. El-Khalil does not have a likelihood of success on the merits. ........11

    2. Dr. El-Khalil will not suffer irreparable harm in the absence of relief...............................................................................................13

    3. DMC would be harmed by the relief sought here.. .................................18

    4. The public interest favors allowing DMC to follow federal law. ...........18

D. The restraining order Dr. El-Khalil proposes would be inappropriate even if he were entitled to relief. ........................................................................................19

CONCLUSION ...................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Doe v. Community Medical Center, Inc.,* 221 P.3d 651 (Mt. 2009)...................... 17

*D.T. v. Sumner Cty. Sch.*, 942 F.3d 324 (6th Cir. 2019).......................... 5, 6, 14, 16

*El-Khalil v. Oakwood Health Care Inc.*,

    2019 WL 6045564 (Mich. Ct. App. Nov. 14, 2019)........................................... 14

*Erard v. Johnson*, 905 F. Supp. 2d 782 (E.D. Mich. 2012)...................................... 5

*McKenzie v BellSouth Telecomms., Inc.*, 219 F.3d 508 (6th Cir. 2000)................. 12

*Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*,

    945 F.2d 150 (6th Cir. 1991) ................................................................. 16

*Reams v. Vrooman-Fehn Printing Co.*, 140 F.2d 237 (6th Cir. 1944) ................ 6, 9

*Schneider v. Flood*, 2010 WL 1657001 (D.V.I. Apr. 23, 2010)............................ 17

*Walker v. Mem. Health Sys. of E. Tex.*,

    231 F. Supp. 3d 210 (E.D. Tex. 2017)........................................................ 17, 19

*Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36 (1st Cir. 2005) ......... 11

*Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008).......................... 5, 2, 4, 7

**Statutes**

31 U.S.C. § 3730................................................................................................ 5, 12

42 U.S.C. § 11101 .................................................................................................... 7

42 U.S.C. § 11111 .................................................................................................... 8

42 U.S.C. § 11133 ............................................................................................ 5, 7, 8

42 U.S.C. § 11136 .......................................................................... 5, 9, 17

42 U.S.C. § 11137 .......................................................................... 5, 14, 15

42 U.S.C. § 11151 .............................................................................. 8, 10

MCL 333.21513(a) .................................................................................. 3

**Rules**

Fed. R. Civ. P. 65(b)(2) ....................................................................... 5, 19

**Regulations**

45 C.F.R. § 60.6 ................................................................................... 5, 9

45 C.F.R. § 60.21 ................................................................................. 5, 9

# CONTROLLING AUTHORITY FOR THE RELIEF SOUGHT

*D.T. v. Sumner Cty. Sch.*, 942 F.3d 324 (6th Cir. 2019)

*Erard v. Johnson*, 905 F. Supp. 2d 782 (E.D. Mich. 2012)

*Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7 (2008)

Fed. R. Civ. P. 65(b)(2)

31 U.S.C. § 3730(h)

42 U.S.C. § 11133(a)(1)(A)

42 U.S.C. § 11136

42 U.S.C. § 11137

45 C.F.R. § 60.6

45 C.F.R. § 60.21

U.S. Dept. of Health and Human Servs., NPDB Guidebook (October 2018)

## STATEMENT OF THE ISSUE PRESENTED

Should this Court enjoin DMC from complying with a federal statutory obligation to report its adverse final decision regarding Dr. El-Khalil's application for reappointment to DMC's medical staff, where Dr. El-Khalil's motion is predicated on misstatements and omissions, and hardly references the applicable statutory scheme, much less establish an entitlement to injunctive relief within it?

Plaintiff answers:                    Yes

DMC answers:                        No

This Court should answer:       No

## INTRODUCTION

Dr. El-Khalil asks this Court to enter a restraining order and preliminary injunction without even analyzing the controlling law. The real issue raised by this motion is whether DMC should be enjoined from complying with a federal statute that *mandates* prompt reporting of its decision not to reappoint Dr. El-Khalil to its medical staff. Rather than take that issue head on, Dr. El-Khalil instead argues—based on knowing misstatements and omissions, no less—that a report about him would just be more of the retaliation he claims to have suffered. This does not entitle him to any relief.

## COUNTER-STATEMENT OF FACTS

In an apparent effort to bolster the prospects of success on his retaliation claim, Dr. El-Khalil omits or misstates numerous points from his "Statement of Facts." The most significant of these are addressed as follows:

1.     Dr. El-Khalil frequently uses the term "Defendants" to conflate actors. *See, e.g.*, Pl's Br. at 3 ("Defendants' health care fraud"). As his own exhibits show, however, Dr. El-Khalil accuses only individuals of engaging in fraud, and then mostly at other institutions.[1] Pl's Mot. at Exs. F, M. Discovery has shown

---

[1] He makes a similar accusation—supported only by his own foundationless affidavit—that Drs. Khalil and Usen have "conspired . . . with the DMC." Pl's Br. at 4. There is no evidence at all of any such conspiracy.

that at least some of what he calls fraud has been sensationalized, if not flatly made-up. For example, in his First Amended Complaint, Dr. El-Khalil describes "Patient A" whose "feet" he alleges "gradually were removed, piece by piece" until, "[b]y November 2017," she "had lost most of both feet." Doc. #35 at ¶¶ 47(I)(a)-(*l*); PageID 299-300. But he has since admitted that this was a Henry Ford—not DMC—patient who, as of November 2017, has lost only a single toe on one foot. Ex. 1, El-Khalil Dep. 179:7-180:21, 192:12-195:23. Astonishingly, Dr. El-Khalil has now perjured himself by repeating these false statements under oath in the affidavit he submitted in support of this motion. *See* Pl's Mot. at Ex. B, ¶ 7(k)(1)-(11).

2.     Dr. El-Khalil insists that his privileges were "suspended" in January 2018. Pl's Br. at 5. But he fails to disclose that his privileges expired automatically on December 2, 2017. Ex. 2, 2016 Reappointment Letter. He also fails to disclose that DMC's normal timing is 90 days from completion of an application for reappointment to a decision on that application. Ex. 3, 11/20/2017 Email. He further fails to disclose that his own packet was incomplete until sometime after that November 20 email because he had not provided the required procedure logs. (*Id.*). And he fails to disclose that DMC itself reiterated that he "should report any and all concerns of fraud regardless of the privileging process." Ex. 4, 1/22/2018 Email.

3. Dr. El-Khalil grossly misstates the process by which medical staff appointments are made at DMC. Applications for reappointment first go to the physician's department for a recommendation. That recommendation is reviewed by a Credentialing Committee, which also makes a recommendation. From there, the Medical Executive Committee (MEC) makes its own recommendation. None of these recommendations are binding, however. The final decision always rests with the Governing Body, which at DMC is comprised of a Joint Conference Committee (JCC) together with the Board. These steps are outlined in the Bylaws of the DMC Medical Staff that were attached to Dr. El-Khalil's own motion. *See* Pl's Mot. at Ex. H, art. III§ 4.A, art. IV. They were also reiterated in various depositions. *See, e.g.*, Ex. 5, Haapaniemi Dep. 27:19-29:11; Ex. 6, Tedeschi Dep. 17:15-18:25. Indeed, the Governing Body's overall authority over selection of the medical staff is ultimately a product of Michigan law. *See* MCL 333.21513(a).

4. Having misstated the process, Dr. El-Khalil then misapplies it to himself. He states that the MEC decided to "renew" his privileges but that— despite having "no appeal right," the JCC "reverse[d] the decision of the MEC." Pl's Br. at 8-9. Yet both the MEC's initial adverse recommendation and its subsequent favorable recommendation were merely advisory. The JCC did not engage in some impermissible appeal; it just considered the MEC's recommendation in the normal course. And, contrary to Dr. El-Khalil's unfounded

assertion that only the fair hearing panel heard "the evidence presented by both sides," Pl's Br. at 8, the subsequent review—including the ad-hoc appeal he requested—was based on the entire record of the fair hearing including a full transcript of the testimony and all of the exhibits. *See* Pl's Mot. at Ex. K (JCC notice letter, detailing materials an appeal committee would receive); *id.* at Ex. A (appeal committee report, detailing materials reviewed).

5. Dr. El-Khalil also fails to disclose that he has adduced no evidence of a causal connection between his reports of alleged wrongdoing (reports that came more than a month after his appointment to the medical staff expired) and the decision not to renew him. After extensive production of documents and six depositions of DMC personnel, the uncontroverted evidence is that the committees did *not* consider his reports in reaching their respective decisions. E.g., Ex. 5, Haapaniemi Dep. 16:17-25, 32:1-16. Indeed, his own deposition ultimately revealed that Dr. El-Khalil commenced this lawsuit based on nothing other than his own speculation that he had been retaliated against here. Ex. 1, El-Khalil Dep. 55:15-57:1, 60:5-61:8, 84:17-85:1.

6. Meanwhile, Dr. El-Khalil also omits any discussion of his own behavior, which ultimately is what showcased the lack of character, judgment and ability to get along with others that led to the adverse determination here. He makes much of the gas-station altercation with his nemesis, Dr. Khalil. But he

does not disclose the exchange that precipitated it, in which he engaged (among other things) in profane name-calling and sexual insults about Dr. Khalil's parents. Ex. 7, Text Messages. Nor does he disclose how he extended and exacerbated that conflict: Every time Dr. Khalil walked away, Dr. El-Khalil shouted still more insults out his window, repeatedly calling Dr. Khalil a "piece of shit" and eventually trying to block his car from leaving. Ex. 1, El-Khalil Dep. 120:6-19, 122:11-124:22.

7.      Finally, Dr. El-Khalil fails to inform the Court that, in connection with the very application for reappointment that he submitted here, Dr. El-Khalil expressly acknowledged that DMC was required to report any adverse action taken regarding his privileges in connection with his professional conduct. Ex. 8, Authorization for Release at ¶ P.

## LEGAL STANDARD

Dr. El-Khalil has a "heavy burden to show that injunctive relief is warranted because '[a] preliminary injunction is an extraordinary remedy never awarded as of right.'" *Erard v. Johnson*, 905 F. Supp. 2d 782, 789 (E.D. Mich. 2012) (quoting *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008)). "Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the

equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019).

That burden weighs even heavier, here, where the supposed "emergency" is of Dr. El-Khalil's own making. *See Reams v. Vrooman-Fehn Printing Co.*, 140 F.2d 237, 242 (6th Cir. 1944) ("It is well settled that 'equity aids the vigilant.'"). As demonstrated by his own exhibits, Dr. El-Khalil has known since May 3, 2019 that the DMC's final decision would be adverse unless his final administrative appeal succeeded. Pl's Mot. at Exs. K, L. And he did not believe he would prevail on that appeal. Ex. 1, El-Khalil Dep. 87:15-24. He could have sought a preliminary injunction any time over the last 11 months, asking the Court as he does now to prevent DMC from reporting an adverse decision about him while this action is pending. Instead, he waited until the appeal was unsuccessful and now wants this Court to act on an emergency basis "even before counsel can be fully heard on the Plaintiff's motion." Pl's Mot at Ex. N.

## ARGUMENT

As shown in the Counter-Statement of Facts, Dr. El-Khalil bases this motion on a factual presentation skewed to bolster his generalized argument that he is likely to prevail on his retaliation claim, and therefore that this Court should enjoin DMC from reporting its adverse decision on his application for reappointment. The problems with that argument are fully discussed below. But first it is

necessary to discuss what Dr. El-Khalil largely ignores, namely, the federal reporting requirements that DMC must satisfy. For the real issue here—the key merits hurdle Dr. El-Khalil needs to clear—is not whether he can ultimately prove retaliation, but rather whether he can show a likelihood that this adverse action is not reportable under the controlling law.

## A. The Health Care Quality Improvement Act of 1986 requires DMC to report its final decision here.

Dr. El-Khalil barely mentions the Health Care Quality Improvement Act of 1986 (HCQIA), much less describes how it operates here. All he does is state in a single sentence that DMC will give notice "pursuant to 42 U.S.C. § 11133(a)(1)(A)." Pl's Br. at 11. He immediately mischaracterizes that notice as a "malicious attempt to defame the plaintiff personally." *Id.* at 12. And he briefly insists that the decision here is not reportable because it does not involve conduct that could affect patient care. *Id.* at 17-18. None of this is accurate.

HCQIA was enacted upon express Congressional findings that nationally coordinated action was needed to make physician peer review effective. 42 U.S.C. § 11101. Among the mechanisms implemented to meet that need was the creation of the National Practitioner Data Bank (NPDB), which is a centralized repository for adverse reports regarding physicians. To ensure that such reports are promptly submitted, HCQIA imposes both mandatory reporting requirements and sanctions for noncompliance.

Specifically, health care entities (including hospitals) are required to report—without exception—any "professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days." 42 U.S.C. § 11133(a)(1)(A). That information goes both to the applicable state licensing body as well as the NPDB itself. If a health care entity fails to make a required report, it can be subject to sanctions including the loss of all statutory immunity for peer-review activities for a three-year period. 42 U.S.C. § 11111(b), 11133(c).

The statutory definitions make clear that the reporting obligation is triggered here. The term "adversely affecting" includes, among other things, "failing to renew clinical privileges or membership in a health care entity." 42 U.S.C. § 11151(1). The term "clinical privileges" is defined broadly to include both actual "privileges" to perform procedures, as well as "membership on the medical staff." § 11151(3). The term "professional review activity" means, among other things, an action "to determine whether the physician may have clinical privileges with respect to, or membership in, the entity." § 11151(10)(A). And the term "professional review action" includes an action "taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients) . . ." § 11151(9).

HCQIA expressly contemplates that physicians may dispute reports made under its requirements. Accordingly, it authorizes the implementation of regulations enabling physicians to dispute the accuracy of those reports. 42 U.S.C. § 11136(2). Those regulations, in turn, establish a detailed process by which a physician may provide either a "subject statement" or seek "dispute resolution" and attempt to show that the report should not have been made. *See* NPDB Guidebook at Ch. F (explaining mechanisms set forth in 45 C.F.R. § 60.21).[2] They also acknowledge that, under certain circumstances, a health care entity may find it necessary to revise, update, or withdraw a report previously made. *See* NPDB Guidebook at E-8 (explaining process to withdraw a report under 45 C.F.R. § 60.6). The Guidebook provides the example of a court overturning a license revocation as a reason for voiding a report. *Id.* Upon the voiding of a report, NPDB notifies the physician as well as anyone who queried the physician's record in the prior three years. *Id.*

## B. Dr. El-Khalil provides no authority showing that this Court may enjoin DMC from making a mandatory report under HCQIA.

Dr. El-Khalil's only nod to HCQIA is to insist that the action here is not reportable because—in his view—it does not affect patient health or welfare. Pl's Br. at 17. But it is hardly so clear cut. The statutory provision at issue (in defining

---

[2] *See* https://www.npdb.hrsa.gov/resources/NPDBGuidebook.pdf

"professional review action") gives a handful of examples of professional conduct issues that are *not* related to patient care.  42 U.S.C. § 11151(9)(A)-(E).  But none of those are on point.  Meanwhile, the NPDB Guidebook offers no more illumination, noting only that "[w]hether an action affects or could affect patient health or welfare is generally a determination that must be made by the entity taking the action."  NPDB Guidebook at E-31, E-46.  The consequence for guessing wrong is statutory sanctions.

It is not a close call here, however.  The record Dr. El-Khalil himself amassed includes physical altercation with another podiatrist, along with Dr. El-Khalil video-recording hostile interactions *in hospital hallways*.  And he reports having to seek a PPO for fear of still more violence.[3]  Meanwhile, he has repeatedly shown that he has no recognition how his own behavior exacerbates this conflict.  *See* Ex. 1, El-Khalil Dep. 120:6-19, 122:11-124:22.  DMC need not show actual harm to patient welfare; it suffices that conduct "could" adversely affect patient welfare.  Open and constant conflict with other physicians, that has erupted into violence and has manifested inside the hospital itself, surely meets that minimal standard.

---

[3] DMC does not condone Dr. Khalil's own actions.  Nor does it seek to punish Dr. El-Khalil for things Dr. Khalil did.  But Dr. El-Khalil has been an active participant in the conflict, as his own text messages show.  Ex. 7.

Dr. El-Khalil otherwise insists that this Court should enjoin DMC in order to "preserve the status quo." Pl's Br. at 2, 14. But the status quo here is that DMC is compelled by federal law to report the adverse decision it made. In other words, Dr. El-Khalil wants this Court to disrupt the regulatory scheme in the hopes that he will eventually show that the DMC acted wrongly. This would be a significant deviation from the ordinary course, not a maintenance of it. As shown above HCQIA establishes a clear policy preference to maximize disclosure, not to suppress it prospectively until fully and finally litigated.

In any event, Dr. El-Khalil himself acknowledged at the time he applied for reappointment that DMC would comply with HCQIA and make a report if it reached an adverse decision. Ex. 8, Authorization for Release at ¶ P. That consent at the front end estops him from now asking this Court to prevent the report.

**C. Even if the Court disregarded Dr. El-Khalil's failure to discuss the controlling legal framework, he still would fail to show entitlement to an injunction here.**

    1. <u>Dr. El-Khalil does not have a likelihood of success on the merits.</u>

Likelihood of success on the merits is the sine qua non of the four-part inquiry— without it, "the remaining factors become matters of idle curiosity." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 46 (1st Cir. 2005). DMC has already shown that Dr. El-Khalil omitted and misrepresented critical facts in order

to bolster the appearance of his prospects for success on the merits.  This is hardly an auspicious start to a request for equitable relief.

In any event, to prevail on his retaliation claim, he would have to show he engaged in protected activity; that DMC knew he did so; and that it took adverse action against him because of that activity.  *See McKenzie v BellSouth Telecomms., Inc.*, 219 F.3d 508, 514 (6th Cir. 2000).  He has problems with all three elements.  For example, his "reports" of alleged wrongdoing are not genuine acts done "in furtherance of" a False Claims Act action or to stop a violation of that statute.  *See* 31 U.S.C. § 3730(h)(1).  Rather, they came through counsel a month after his privileges lapsed, and only *after* DMC had questioned him about his own behavior.  *See* Exs. 2, 3.  In other words, they are just as consistent with deflection and maneuvering as they are with an altruistic motive.

It is the third element, however—a causal connection between his activity and the adverse action—that should end this action at the summary judgment stage.  Conspicuously missing from Dr. El-Khalil's brief is any document or deposition testimony connecting his "reports" to the decision not to reappoint him.  The end of discovery is imminent—it already would have closed but for his counsel's scheduling conflicts.  If there were any evidence of causation, Dr. El-Khalil would have provided it with his motion.  Instead, he leans only on what the fair hearing panel "surmised."  Pl's Br. at 17.  With all due respect to the panel and the work it

put into this matter, supposition based on the narrowly constrained record being reviewed on a fair hearing is not admissible evidence of retaliation for purposes of a federal lawsuit.

Indeed, Dr. El-Khalil has admitted that he has no factual basis of his own to support his claim of retaliation.  Ex 1, El-Khalil Dep. 55:15-57:1, 60:5-61:8, 84:17-85:1.  Meanwhile, Dr. Haapaniemi—who chairs the MEC and sits on the governing body—testified that the discussions about Dr. El-Khalil were about his disruptive behavior and lack of professionalism, not that he reported fraud.[4]  Ex. 5, Haapaniemi Dep. 16:17-25, 32:1-16.  And the full record on which Dr. El-Khalil's reappointment to the DMC medical staff ultimately was denied includes the wholly unprofessional text messages and videos that he himself injected into the process. *See* Ex. 7, Text Messages.

In short, Dr. El-Khalil's motion fails to show even a triable issue of causation.  It certainly does not carry the heavy burden of establishing a strong probability of success on the merits.

2.  <u>Dr. El-Khalil will not suffer irreparable harm in the absence of relief.</u>

Of the four factors, "the irreparable harm requirement . . . . is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant

---

[4] When it moves for summary judgment, DMC will further detail Dr. El-Khalil's own erratic behavior that led to the initial adverse MEC recommendation.

relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). Dr. El-Khalil accordingly devotes more than two pages of his "Statement of Facts" to predicting dire consequences that he says will befall him if the DMC were to file its mandatory report here. Pl's Br. at 11-13. These predictions are not justified.

To begin, Dr. El-Khalil yet again fails to disclose critical facts. He emphasizes the absence of prior complaints about him *at two particular hospitals*, Henry Ford and Garden City. Pl's Br. at 12. But he remarkably says nothing about the numerous professionalism complaints made against him at Oakwood Health. *See El-Khalil v. Oakwood Health Care Inc.*, No. 329986, 2019 WL 6045564 (Mich. Ct. App. Nov. 14, 2019) (describing complaints).

He also fails to mention that Oakwood decided in 2015 not to renew his privileges, and reported that fact to the NPDB. This is relevant here because Dr. El-Khalil submitted statements disputing that action.[5] DMC thereafter reappointed him for a year. So the notion that he will become a pariah the moment a report is made is not supported even on his own personal experience.

---

[5] The NPDB reports reflecting this information have not been attached to this motion because they are subject to a statutory confidentiality requirement. 42 U.S.C. § 11137. They can, however, be provided to the Court *in camera* upon request.

Moreover, NPDB reports are confidential and are disclosed only to authorized recipients (such as hospitals) upon receipt of a query—such as when new privileges or reappointment are sought. 42 U.S.C. § 11137. Dr. El-Khalil identifies no such imminent events. If there were any, however, he himself would be required in connection with those applications to disclose this adverse determination independently. In other words, the NPDB query is merely a verification to ensure that a physician has not concealed adverse information. The only way Dr. El-Khalil could be "harmed" by DMC making its mandatory report would be if he tried to get away with falsifying his own privileging history.

Meanwhile, his legal battles with Oakwood—another health system he accused of retaliation—has been public record since 2014. This case itself has been pending for more two and a half years. And he himself is the one who, despite DMC's objections, repeatedly has divulged confidential, peer-review details in public filings. Indeed, this motion provides an ironic example: During the telephone call seeking concurrence, counsel for DMC suggested the entire motion (rather than just a few selected portions)[6] should be filed under seal and confirmed that DMC would not oppose such a sealed filing. Dr. El-Khalil ignored that suggestion and thus made the entire course of his unsuccessful application a

---

[6] Even this partial sealing was not done effectively: The document submitted under seal as Plaintiff's Exhibit I (with corresponding redactions of quotations in the brief) was itself both attached to and heavily quoted in Plaintiff's Exhibit L.

matter public record. It is not credible to suggest that a confidential report to regulators at this stage would change anything, much less inflict irreparable harm.

He also says that a report will impair his "ability to serve his current patients" and that he may be forced to "discontinue longtime relationships" with "patients who may need the DMC." Pl's Br. at 12-13. This is disingenuous: Dr. El-Khalil's membership on the DMC medical staff lapsed in December 2017. Ex. 2. He has been continuously engaged in administrative appeals thereafter. So it has been years since he could treat a patient at DMC; and a report—or not—will change nothing about his ability to do so.[7]

That Dr. El-Khalil's own assertions do not even amount in a general context to irreparable harm is reason enough to deny his motion. *D.T. v. Sumner Cty. Sch.*, 942 F.3d at 327. Even more so, however, in the context of HCQIA reporting:

As explained above, HCQIA reflects a Congressional determination that a mandatory disclosure regime is a critical component to achieving effective peer review and maximizing patient safety. In doing so, Congress plainly subordinated

---

[7] DMC will not address his remaining assertions, such as his alarmist prediction of having to spend "hundreds of thousands of dollars in legal fees" to answer questions and his absurd accusation that, in complying with federal law, DMC is engaging in some "underhanded attempt to go around this court" and run up his costs. *See* Pl's Br. at 12. "To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *D.T. v. Sumner Cty. Sch.*, 942 F.3d at 328 (quoting *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)).

the interests of individual physicians in avoiding that disclosure, providing instead for opposition statements and after-the-fact dispute resolution. *See* 42 U.S.C. § 11136(2). To say Dr. El-Khalil would suffer irreparable harm from reporting would be to negate the policy implemented by the statute.

Dr. El-Khalil's cases do not change this conclusion.[8] For example, in *Walker v. Memorial. Health System of East Texas*, the court found irreparable harm because the sanction at issue was actually "non-reportable" in that it lasted less than 30 days. 231 F. Supp. 3d 210, 215 (E.D. Tex. 2017). Moreover, the report there was to accuse the physician of having "substandard or inadequate skill," which is a far cry from stating that he has engaged in disruptive and unprofessional conduct. *See id.* at 216. In contrast, disruptive conduct is something that can be remediated; indeed, numerous organizations offer courses to help physicians overcome problem behavior.

---

[8] Dr. El-Khalil's second case, *Schneider v. Flood*, 2010 WL 1657001 (D.V.I. Apr. 23, 2010), does not provide any background detail or reasoning to explain the result. All that can be said from it is that the plaintiff sought a TRO nine days after an initial review was announced, which likely does not qualify as a reportable event. *See id.* at *1. Meanwhile, *Doe v. Community Medical Center, Inc.* found irreparable harm in the space of three sentences, without any discussion of the balance struck in the statutory scheme and over a blistering dissent on this very issue. 221 P.3d 651, 661 (Mt. 2009). In any event, neither of these cases appears to involve the extensive public disclosure that Dr. El-Khalil himself has made regarding his adverse membership decisions at DMC and elsewhere.

Moreover, contrary to his assertions, Dr. El-Khalil is hardly the innocent victim he presents himself as. The administrative proceedings here amassed a significant amount of material—through his own submissions—showing that Dr. El-Khalil through his own actions had failed to exhibit the professionalism, character, and ability to work with others that is required of members of the DMC medical staff. *See, e.g.*, Ex. 7, Text Messages. He cannot bring adverse consequences on himself and then cry, "irreparable harm." Nor can he claim to be irreparably harmed by a report he expressly authorized DMC to make. Ex. 8, Authorization for Release, at ¶ P.

3. <u>DMC would be harmed by the relief sought here.</u>

Dr. El-Khalil's short discussion of this element is predicated on a falsehood: He says that DMC obtains no benefit from reporting other than to "further its retaliatory purpose." Pl's Br. at 19. As shown, however, this report is required by law and DMC would be subject to an onerous sanction—loss of all peer-review immunity for three years—if it failed to make the mandatory report.

4. <u>The public interest favors allowing DMC to follow federal law.</u>

Dr. El-Khalil's final argument is a straw-man: He argues that the public interest is served by promoting reporting of healthcare fraud. But that is an argument for enforcing the False Claims Act, not for suspending the operation of the Health Care Quality Improvement Act.

The simple fact is that Dr. El-Khalil has merely made an unproven accusation of retaliation. Meanwhile, DMC has an indisputable obligation under HCQIA to report the adverse action it took. If Dr. El-Khalil somehow were to prevail on his claim—which is unlikely, given his failure after nearly 30 months of litigation to develop any actual evidence of retaliation—then DMC would void its report and NPDB would notify any entities that had queried Dr. El-Khalil's record. This is the balance struck by federal law. While deviating from it might serve Dr. El-Khalil's personal interest, it does not serve the public interest.

**D.    The restraining order Dr. El-Khalil proposes would be inappropriate even if he were entitled to relief.**

As shown above, Dr. El-Khalil is not entitled to any relief here. Moreover, the restraining order he proposes is improper. Of course, a restraining order must "describe the injury and state why it is irreparable" and "state why the order was issued without notice." Fed. R. Civ. P. 65(b)(2). But this proposed order goes farther, converting Dr. El-Khalil's contentions about hypothetical future harms he may suffer into judicial findings about what he "will" suffer. Pl's Mot. at Ex. N. More problematic still, he also slips in a proposed judicial finding that the DMC has engaged in "apparent retaliation" against him (despite, as discussed above, the complete absence of admissible evidence that DMC even considered his reports when making its decision regarding his medical staff membership). *Id.*

This is not just semantics.  Courts speak through their orders; and this proposed order prejudges both the follow-on preliminary injunction he seeks as well as the merits of the entire case.  It cannot issue.

## CONCLUSION

Dr. El-Khalil has brought this motion based on misstatements, omissions, and an outright failure to discuss the statutory framework that he proposes to disrupt.  Even with all that, he still cannot satisfy the standards for injunctive relief.  His motion should be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

**BUSH SEYFERTH PLLC**
Counsel for The Detroit Medical Center

By: /s/Roger P. Meyers
    Roger P. Meyers (P73255)
    Andrea S. Carone (P83995)
    BUSH SEYFERTH PLLC
    100 W. Big Beaver Rd., Ste. 400
    Troy, MI 48084
    (248) 822-7800
    meyers@bsplaw.com

</div>

Dated: April 28, 2020

## CERTIFICATE OF SERVICE

I hereby certify that, on April 28, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF System, which will send notification to all parties of record.

By:   /s/ Roger P. Meyers

Roger P. Meyers (P73255)