UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALI EL-KHALIL, DPM,

        Plaintiff,

                                            Case No. 18-cv-12759

v.

                                            HON. MARK A. GOLDSMITH

ANTHONY TEDESCHI, et al.,

        Defendants.

_____/

**OPINION & ORDER
DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION (Dkt. 115)**

       Plaintiff Ali El-Khalil has brought three claims against Defendant Detroit Medical Center ("DMC") and individual fellow doctors: retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h); conspiracy to violate the retaliation provision of the FCA; and tortious interference with an advantageous business relationship. The gist of the claims is that Defendants retaliated against El-Khalil, by DMC declining to reappoint El-Khalil to the medical staff at DMC after El-Khalil reported to the FBI that some of the Defendants had engaged in billing fraud.[1] The instant motion for a temporary restraining order and preliminary injunction concerns an action that DMC is poised to take, which El-Khalil claims is part of the retaliatory scheme.

---

[1] DMC's bylaws define "Appointment" as "Appointment or Reappointment to Medical Staff membership with Clinical Privileges." DMC Bylaws (Revised 2014), Ex. H to Mot. at 5 (Dkt. 115-9). Clinical Privileges are defined as "Permission granted to a Medical Staff Member to provide patient care, including access to DMC equipment, facilities and personnel, within well-defined limits, based on the Member's license, experience, competence, ability and judgment, as more specifically described in Medical Staff Policy." Id. Thus, a refusal to reappointment a clinician after his credentials lapse deprives him of his ability to practice medicine at the hospital.

As discussed in greater length below, DMC maintains that its decision not to reappoint El-Khalil triggers an obligation under the Health Care Quality Improvement Act of 1986 ("HCQIA") to report the decision to the National Practitioner Data Bank ("NPDB"). See 42 U.S.C. § 11133. El-Khalil has filed the instant motion to prevent DMC from reporting its decision to the NPDB and state regulatory agencies (Dkt. 115). DMC filed a response (Dkt. 119), and both parties, through counsel, participated in an April 29, 2020 telephonic hearing.

The motion is denied because El-Khalil has not met his burden of showing a strong likelihood of success on the merits of the claim; the injunction would provide him minimal, if any, protection from irreparable harm; and the public interest is served by compliance with HCQIA and state reporting law.

## I.  BACKGROUND

### A. El-Khalil's disputes with his co-workers

El-Khalil has testified that he began meeting with federal authorities in late 2016 concerning alleged billing fraud by Defendants Mohammed Khalil, Nsima Usen, Mahmud Zamlut, and Leonard Ellison. El-Khalil Aff., Ex. B to Mot., ¶ 6 (Dkt. 115-3).[2] Before and since then, El-Khalil has had difficulties with those Defendants, particularly Khalil. El-Khalil points to these difficulties as substantiating animus on the part of some Defendants for his cooperation with federal authorities; DMC says they demonstrate El-Khalil's disruptive behavior patterns—the basis given for the adverse decisions taken against him.

One such difficulty was a July 22, 2016, text exchange between El-Khalil and Khalil, in which El-Khalil accused Khalil of "stealing" his patients before devolving into a mutual series of profane insults. July 2016 Text Exchange, Ex. 7 to Resp. (Dkt. 119-8).

---

[2] The claims against Ellison were dismissed by stipulation on February 26, 2019 (Dkt. 53).

A more serious difficulty occurred on October 10, 2017, when El-Khalil was involved in an altercation with Khalil. See Police Report, Ex. C to Mot. (Dkt. 115-4). Based on the police report, drawn primarily from El-Khalil's statement and a video El-Khalil took, Khalil appears to have been the aggressor and the only one of the two to use physical force. Id. at 2-3. The report also mentions that El-Khalil appeared to have attempted to block Khalil in the parking lot with his vehicle. Id. El-Khalil told the police officer who wrote the report that he had previously reported Khalil to the FBI for medical fraud, although the report notes the officer's suspicion that "there was more to the argument than [El-Khalil] turning [Khalil] in for medical fraud." Id. at 3. On November 30, 2017, El-Khalil filed a petition for a personal protective order against Khalil. PPO Petition, Ex. E to Mot. (Dkt. 115-6).

DMC also refers to an incident in which El-Khalil video-recorded hostile interactions he had in hospital hallways, although it does not specify when or with whom these incidents occurred and fails to provide record support regarding them. Resp. at 10.

**B. El-Khalil's attempted reappointment and accusations of retaliation**

In addition to the history of friction with individual Defendants, the history of El-Khalil's formal encounters with DMC is an important component of his retaliation theory, as those encounters comprise, in his view, inconsistent DMC actions masking its nefarious intent.

El-Khalil has had staff privileges at DMC since 2008. Mot. at 2. According to El-Khalil, his privileges "were renewed every two years without incident until Plaintiff reported fellow DMC doctors were violating the Federal False Claims Act to the Federal Bureau of Investigation ('FBI')." Id. His most recent renewal occurred in December 2016, when DMC's Joint Conference

Committee ("JCC") sent notice that it approved El-Khalil's appointment through December 2, 2017.  2016 Reappointment Letter, Ex. 2 to Resp. (Dkt. 119-3).[3]

On November 20, 2017, DMC Credentialing Specialist Deborah Freeman notified El-Khalil that his credentials were at risk of expiring on December 2, 2017, because she had not received his case logs in a timely manner.  Freeman November 2017 Email, Ex. 3 to Resp. (Dkt. 119-4).  Although the record does not show when or if El-Khalil cured this error, Freeman sent a second email, on December 14, 2017, stating:

> Good morning Dr. El-[K]halil your privileges are in good standing and you can continue to see in-house patients and do in-house consults and anything else as far as in-patient.  [Y]ou will be receiving a letter within a month to let you know that you have been through the re-appointment process in good standing, and will be re-appointed in the next 2 years [sic]. . . .

Freeman December Email, Ex. E to Mot. (Dkt. 115-6).

Despite Freeman's December Email informing El-Khalil that he would be reappointed, DMC apparently was investigating El-Khalil.  According to El-Khalil, Dr. Aaron Maddox attempted to call him on January 7, 2018, in connection with the renewal of his privileges at DMC.[4]  El-Khalil Aff. ¶ 14.  The next day, El-Khalil's attorney, Ben Gonek, sent an email to Maddox offering to address any concerns Maddox or DMC had about problems El-Khalil had at Beaumont Dearborn, formerly known as Oakwood Hospital Dearborn ("Oakwood"), that had resulted in Oakwood's decision not to renew his privileges.  January 8, 2018 Email, Ex. F to Mot. (Dkt. 115-7).

---

[3] The JCC is "[a] delegated Board committee of the Governing Body with members from the Medical Staff, Administration and the Governing Body.  The committee's delegated duties include decisions related to the quality of patient care and safety, medical staff membership and privileges."  DMC Bylaws (Revised 2014) at 6.

[4] Maddox's role in the process is not entirely clear.  El-Khalil testified that he spoke with him on the phone, although the excerpt of his deposition is too truncated to provide much detail.  See El-Khalil Dep., Ex. 1 to Resp. (Dkt. 119-2).

4

In his email to Maddox, Gonek framed Oakwood's 2015 decision not to renew his privileges as retaliation for El-Khalil's cooperation with federal authorities in investigating health care fraud. Id. He asserted that El-Khalil "has never had any complaints for negligence or issues involving patient care . . . ." Id. at 2. He also expressed El-Khalil's concern that Khalil, Zamlut, and/or Mahir Elder "may be attempting [to interfere] with his privileges being renewed at DMC/Harper Hospital." Id. Gonek stated that Khalil had assaulted El-Khalil, and that Khalil, Zamlut, and Elder were among the individuals El-Khalil had reported to federal authorities.

The record does not reflect when Maddox or other DMC staff first learned about the incident at Oakwood. However, DMC has noted that El-Khalil's dispute with Oakwood has been public record since 2014, and that Oakwood's 2015 decision not to renew his credentials was reported to the NPDB. Resp. at 14-15. This raises some question as to why the incident was being investigated in January 2018, and why it had not been fully investigated before DMC reappointed El-Khalil in December 2016.

Two weeks after Gonek's email, El-Khalil was informed that his DMC privileges had been suspended. El-Khalil Aff. ¶ 15. Gonek then sent an email to Frances Fenelon, regional counsel for DMC's parent company. See January 22, 2018 Emails, Ex. 4 to Resp. (Dkt. 119-5). Gonek told Fenelon that El-Khalil had been informed that day that his privileges had been suspended; stated his belief that the suspension was attributable to El-Khalil's cooperation with the federal government; and threatened to sue under the retaliation provision of the FCA. Id. Fenelon replied that she was unaware of any action against El-Khalil; asked what made El-Khalil believe his privileges were being suspended; encouraged El-Khalil and Gonek to report fraud concerns "regardless of the privileging process"; and requested a courtesy copy if Gonek filed suit on El-Khalil's behalf. Id.

5

Two months later, on March 20, 2018, Defendant Anthony Tedeschi, DMC's CEO at the time, sent a letter notifying El-Khalil that the Medical Executive Committee ("MEC") had voted to deny El-Khalil's reappointment. Notice of Adverse Decision and Right to Appeal, Ex. G to Mot. (Dkt. 115-8).[5]

### C. DMC's purported basis for denying El-Khalil's reappointment

In the MEC's notice, Tedeschi said that El-Khalil's "pattern of disruptive and aggressive behavior reflect[s] a lack of the judgment, ethics, professionalism, and ability to work with others that are required and expected of DMC Medical Staff members." Id. at 2. Although DMC has not furnished in response to the instant motion any evidence to support that position, it has promised to detail El-Khalil's "erratic behavior that led the initial adverse MEC recommendation" in a forthcoming motion for summary judgment. Resp. at 13 n.4. It has maintained that El-Khalil's behavior, not retaliatory animus, motivated its decision to deny his reappointment.

DMC also emphasizes that El-Khalil's credentials lapsed automatically on December 2, 2017, contradicting El-Khalil's claim that his privileges were "'suspended' in January 2018." Counterstatement of Material Facts ¶ 2 (Dkt. 119). According to DMC, when the accusations of retaliation began in January 2018, a final decision had not yet been made whether to reappoint El-Khalil. Id. ¶ 3. Confronting the potential contradiction with the Freeman December Email, DMC stated at the hearing on the instant motion that Freeman's statement was inaccurate and that the multi-step reappointment process had not yet been concluded when she sent her email.[6]

---

[5] The claims against Tedeschi were dismissed by stipulation on March 17, 2020 (Dkt. 108).

[6] According to DMC, applications for reappointment first go to the physician's department, whose recommendation is reviewed by the Credentialing Committee, which also makes a recommendation. Counterstatement of Material Facts ¶ 3 (Dkt. 119). The MEC reviews these recommendations and makes its own recommendation. Id. Finally, the Governing Body—composed of the JCC and the Board—makes the final decision on whether to renew or deny privileges. Id. The DMC Bylaws (Revised 2014) discuss this process in greater detail.

### D. El-Khalil's appeals

El-Khalil appealed the MEC's decision shortly after the MEC's March 2018 denial of reappointment, triggering a so-called "Fair Hearing" before a panel of five doctors on DMC's medical staff. See DMC Bylaws (Revised 2014) at 31-36. On February 26, 2019, the hearing panel issued a report and recommendation based on a hearing that took place on December 17, 2018 and February 12, 2019. Report & Recommendation of Hearing Panel, Ex. I to Mot. (filed under seal at Dkt. 117). The hearing panel found substantial procedural and substantive errors in the MEC's decision and expressed suspicion about the fact that El-Khalil was reappointed numerous times since 2008 without any discussion of his behavior, until he began accusing co-workers of FCA violations. Id.

On March 22, 2019, John Haapaniemi, president of DMC's medical staff and chairman of the MEC, sent El-Khalil notice that "the MEC has reversed its prior Adverse Recommendation," and that his "status with the DMC remains as it has been prior to the MEC's initial Adverse Recommendation." Notice of MEC Decision, Ex. J. to Mot. (Dkt. 115-11).

Ultimately, DMC did not adopt the recommendations of the MEC and the hearing panel. On May 3, 2019, JCC Chair John Levy sent a letter informing El-Khalil that the JCC was denying him reappointment despite the report and recommendation of the hearing panel and the MEC's reversal. Notice of JCC Decision, Ex. K to Mot. at 1 (Dkt. 115-12).

On May 21, 2019, El-Khalil appealed. Appeal of the JCC's Decision Denying Reappointment, Ex. L to Mot. (Dkt. 115-13). On January 9, 2020, the "Ad-Hoc Appeals Committee" recommended that the JCC affirm its denial. April 2020 Emails, Ex. A to Mot., at 6 (Dkt. 115-2). On Friday April 24, 2020, DMC's attorney Roger Meyers sent Gonek an informal

notice by email that the appeal had been denied, with formal notice expected to issue the following week. Id. at 2.

This motion was then filed to enjoin DMC from reporting the adverse privileging decision to the NPDB, the Michigan Department of Licensing and Regulatory Authorities ("LARA"), and other regulatory authorities.

## II. STANDARD OF REVIEW

To determine whether to grant a preliminary injunction or temporary restraining order, a district court must consider: (i) whether the movant has a strong likelihood of success on the merits; (ii) whether the movant would suffer irreparable injury without the injunction; (iii) whether issuance of the injunction would cause substantial harm to others; and (iv) whether the public interest would be served by the issuance of the injunction. Baker v. Adams Cty./Ohio Valley Sch. Bd., 310 F.3d 927, 928 (6th Cir. 2002). These four factors "are factors to be balanced, not prerequisites that must be met." Hamad v. Woodcrest Condo. Ass'n, 328 F.3d 224, 230 (6th Cir. 2003).

## III. ANALYSIS

### A. Likelihood of success on the merits

The first question is whether El-Khalil has shown a strong likelihood of success on the merits. The injunction requested relates to El-Khalil's claim that DMC refused to renew his credentials as retaliation for engaging in activity protected by the FCA. See Mot. at 14-18. The FCA's anti-retaliation provision authorizes the Court to grant all relief necessary to make the victim whole, and such relief explicitly includes reinstatement. 31 U.S.C. § 3730(h)(1). Success on the FCA retaliation claims against DMC could, therefore, result in the reinstatement of El-Khalil's privileges, obviating the basis for DMC's report to the NPDB. An injunction preventing

DMC from reporting its adverse privileges decision to the NPDB might be an appropriate means of maintaining the status quo until the FCA retaliation claim is adjudicated on the merits—if El-Khalil could prove that he was likely to succeed on his retaliation claim.

"Retaliatory discharge claims under the FCA proceed under the same rules applicable to other employment-related retaliation claims." Jones-McNamara v. Holzer Health Sys., 630 F. App'x 394, 397-3398 (6th Cir. 2015). Plaintiffs may prove their case by direct evidence or circumstantial evidence. Id. at 398. "Direct evidence is evidence, which if believed, does not require an inference that unlawful retaliation motivated an employer's action." Id. (internal quotations omitted). Plaintiffs may also prove their cases through circumstantial evidence by following the McDonnell Douglas burden shifting framework, articulated as follows:

> Under the McDonnell-Douglas test, the plaintiff bears the initial burden to demonstrate a prima facie case of retaliation. . . . To establish a prima facie case, the plaintiff must show the following elements: (1) she was engaged in a protected activity; (2) her employer knew that she engaged in the protected activity; and (3) her employer discharged or otherwise discriminated against the employee as a result of the protected activity. . . . Once the plaintiff establishes this prima facie case, the defendant bears the burden of producing a legitimate, nondiscriminatory reason for the adverse employment action. . . . At that point, the burden again shifts to the plaintiff to demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination.

Id. (internal citations omitted).

Although El-Khalil does not frame his argument in terms of the "direct" or "circumstantial" routes, his emphasis on the timing of events and his citation to such cases as Mikhaeil v. Walgreens Inc., No. 13-14107, 2015 WL 778179 (E.D. Mich. Feb. 24, 2015) and Ickes v. Nexcare Health Systems, LLC, 178 F. Supp. 3d 578 (E.D. Mich. 2016), make clear that he is pursuing a claim based on circumstantial evidence.

DMC first argues that El-Khalil did not engage in protected activity, by claiming that Gonek's January 8, 2018 Email was not a "genuine [act] done 'in furtherance' of a False Claims

Act actions or stop a violation of that statute." Resp. at 12 (quoting 31 U.S.C. § 3730(h)(1)). But El-Khalil does not argue that the January 8, 2018 Email was his protected activity. See Mot. at 15-16. Rather, he refers to his cooperation with the FBI, beginning in late 2016 as his protected activity. Id.; El-Khalil Aff. ¶ 6. Gonek's January 8, 2018 Email simply represents the latest possible act putting DMC on notice that El-Khalil was engaged in purported protected activity and his belief that this activity might be influencing the credentialing process. Assuming El-Khalil can substantiate his claim that he had been working with the FBI, he can likely establish that DMC was aware he was engaging in protected activity before the MEC reached its adverse credentialing decision in March 2018, and well before it reached its final decision to deny El-Khalil privileges in 2020.

Whether El-Khalil can prove that his protected activity caused DMC to take adverse actions against him is another matter. On the one hand, one attempt by DMC to refute causation appears unsupported. It emphasizes the fact that El-Khalil's privileges lapsed prior to the January 8, 2018 Email, which Gonek sent "only after DMC had questioned [El-Khalil] about his own behavior. See Exs. 2, 3." Resp. at 12. However, the exhibits to which DMC refers—the 2016 Reappointment Letter and the Freeman November 2017 Email—provide no support for the proposition that DMC had questioned El-Khalil about the behavior that DMC claims motivated its credentialing decision. The Freeman November 2017 Email cited untimely case logs, and the 2016 Reappointment Letter says nothing about El-Khalil's behavior. Furthermore, the Freeman December 2017 Email, which purported to notify El-Khalil that his privileges were in good standing and that he would be re-appointed shortly, casts doubt on DMC's narrative.

Nevertheless, El-Khalil bears the burden at trial of proving that his engagement in protected activity caused the adverse credentialing decision, and he bears the burden of proving that his

10

likelihood of success on that claim warrants temporary injunctive relief now. At the April 29 hearing, he rested his case almost exclusively on the findings of the hearing panel—which had concluded that the timing of the MEC's decision was suspicious and the product of grave errors in process and substance. Report & Recommendation of Hearing Panel. The hearing panel had access to live witness testimony, video evidence, and written evidence. Id. However, without access to this record, the Court cannot determine that a jury would be likely to reach the same conclusions as the hearing panel. Furthermore, the Court cannot determine that the entirety of the record the hearing panel relied upon would be admissible at trial, nor that additional evidence would not warrant a different conclusion. Finally, the Court cannot simply credit or defer to the conclusion of one of DMC's semi-adjudicatory bodies when others—the MEC, the Ad-Hoc Appeals Committee, and the Governing Body—reached contrary conclusions.

El-Khalil must ultimately prove his claim using evidence—not the hearing panel's assessment of the evidence—and he has not yet done so convincingly. DMC decisionmakers such as MEC Chair Haapaniemi have testified that complaints about El-Khalil's "disruptive, abusive or aggressive behavior; lack of professionalism" motivated the decision. Haapaniemi Dep., Ex. 5 to Resp., at 16 (Dkt. 119-6). In light of El-Khalil's conflicts with his co-workers, this explanation seems plausible enough. See Police Report; July 2016 Text Exchange.

At the April 29 hearing, El-Khalil struggled to articulate a motive for DMC to retaliate against him for his reporting doctors—not DMC itself—for medical fraud. Counsel repeatedly referred to the disparate treatment between El-Khalil and Khalil—who apparently still has privileges at DMC—despite Khalil arguably behaving worse than El-Khalil in their altercations. But El-Khalil has not presented enough evidence of the pair's similar situation to support an inference of disparate treatment, nor has he sufficiently explained why such an inference would

11

support his FCA retaliation claim against DMC. These claims may be sharpened as the case progresses, but they do not support injunctive relief at this stage.

At most, El-Khalil may have created a fact issue. But the party seeking the extraordinary relief of a preliminary injunction must do more than create a fact issue, as the "proof required . . . to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." Leary v. Daeschner, 228 F.3d 729, 739 (6th Cir. 2000). El-Khalil has failed to do so, counseling denial of his motion.

**B. The harm to El-Khalil**

The second factor asks whether El-Khalil would suffer irreparable injury without the injunction. El-Khalil argues that a report to the NPDB and state regulators would irreparably harm his personal and professional reputation; destroy his career; necessitate legal fees as he seeks or defends his credentials elsewhere; undermine his ability to receive privileges elsewhere; prevent him from caring for patients at DMC; undermine his ability to litigate this case; drive up his insurance costs; and force him to disclose the report to insurers, managed care organizations, and other payers. Mot. at 11-13. Many of these consequences are financial and quantitatively determinable—hence compensable by damages following trial—counseling against injunctive relief. At the same time, El-Khalil's inability to treat patients at DMC—and any harm that inability might cause him and his patients—could not possibly be cured by the proposed injunction, because the injunction would not restore his privileges at DMC.

The remainder of the parade of horribles is unpersuasive because of the limited scope of the injunction sought. El-Khalil seeks only to prevent DMC from reporting its adverse credentialing decision to the NPDB and state regulators. The credentialing decision would remain public knowledge simply by virtue of this lawsuit, and El-Khalil's counsel admitted at the April

12

29 hearing that El-Khalil has self-reporting obligations to disclose DMC's decision to most, if not all, of the entities that would learn of the decision if DMC proceeded to report it to the NPDB and Michigan regulators—including other hospitals at which he currently has privileges. Thus, El-Khalil has not established that the marginal effect of DMC reporting its decision will create any additional harm.

Finally, the NPDB and analogous state databases are primarily tools for informing those who need to be informed of negative marks on a healthcare provider's record. If El-Khalil ultimately prevails on his retaliation claim, he will likely be able to avoid much of the harm stemming from the "stain" on his record by the removal of this incident from databases. Furthermore, the NPDB maintains a dispute process. NPDB Guidebook at F-5.[7] "When a report is entered into Dispute Status by the subject of the report, the NPDB sends a notification of the dispute to the reporting entity and all queriers who received the report within the past 3 years. The notification will be included with the report when it is released to future queriers." Id. This process should ensure El-Khalil's right to present his version of events to other credentialing authorities, mitigating any harm done by disclosure. If his evidence of retaliation is as persuasive as he believes it is, he should not have difficulties persuading other authorities to disregard DMC's decisions—much as DMC itself granted El-Khalil privileges despite an NPDB report showing that Oakwood failed to renew his credentials there in 2015. See Resp. at 14. As that fact shows, a negative credentialing is not nearly as destructive to a career as El-Khalil argues.

In sum, El-Khalil has failed to prove he would suffer irreparable injury without the injunction.

---

[7] El-Khalil provides an excerpt from the NPDB Guidebook as Exhibit O to his motion (Dkt. 115-16). The full NBDP Guidebook is available for download at https://www.npdb.hrsa.gov/resources/aboutGuidebooks.jsp (last visited on May 1, 2020).

### C. The harm to others

The third factor asks whether issuance of the injunction would cause substantial harm to individuals other than the movant. DMC argues that it would be harmed because it has an obligation under HCQIA to report its decision. Resp. at 18. But an order from this Court could relieve DMC of that burden. See Walker v. Mem'l Health Sys. of E. Texas, 231 F. Supp. 3d 210, 217 (E.D. Tex. 2017) ("It is the province of the federal courts—not the Hospital—to determine the requirements of HCQIA, a federal statute. Any injunctive relief ordered by the Court would compel the Hospital to comply with federal law, not violate it."). DMC has failed to identify any real harm it would experience if El-Khalil's motion were granted, nor has it identified harm to other specific individuals.

### D. The public interest

Through HCQIA, Congress has expressed its belief that reporting adverse credentialing decisions to a national database serves the public interest. See generally 42 U.S.C. §§ 11101, 11133. But reporting an adverse credentialing decision made in bad faith and in contravention of another federal law, such as the FCA, would disserve the public interest—because it could deprive the public of a good doctor, and because it would discourage whistleblowing. The reconciliation of these competing public interest considerations must turn on the strength of the case presented by the doctor who claims to have been victimized. Thus, in our case, the question of whether granting temporary equitable relief would serve the public interest depends on the persuasiveness of El-Khalil's evidence that DMC declined to reappoint him as retaliation for reporting fraud. Without a strong case that the reporting is a continuation of a retaliatory campaign, a restraining order or injunction could well undermine the information-clearinghouse structure that Congress erected to protect the quality of health care. El-Khalil's claim fails on this count because

14

he has not shown a strong likelihood of success on the merits of his retaliation claim. Until he does so, the public interest is better served by DMC's compliance with HCQIA.

### IV. CONCLUSION

El-Khalil has not shown a strong likelihood of success on the merits of his retaliation claim, nor has he shown that he will suffer irreparable harm that issuance of an injunction would prevent. Therefore, his interests are outweighed by the public's interest in a properly disseminated notice of actions taken against him by a health care institution. His motion (Dkt. 115) is denied.

SO ORDERED

Dated: May 4, 2020   s/Mark A. Goldsmith
Detroit, Michigan    MARK A. GOLDSMITH
                     United States District Judge