UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALI EL-KHALIL,

    Plaintiff,
vs.

Case No. 18-12759
HON. MARK A. GOLDSMITH

NSIMA USEN, et al.

    Defendants.
_____/

**OPINION & ORDER
GRANTING THE DETROIT MEDICAL CENTER'S MOTION FOR SUMMARY
JUDGMENT (Dkts. 154, 164), DISMISSING ALL OTHER CLAIMS WITHOUT
PREJUDICE, AND DENYING THE REMAINING MOTIONS (Dkts. 153, 159, 194, 196)
WITHOUT PREJUDICE**

Four summary judgment motions have been filed, but only one needs to be addressed. It is the one filed by Defendant Detroit Medical Center ("DMC") (Dkts. 154, 164) ("DMC MSJ"), which concerns a claim of retaliation under the False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"), over which the Court has subject matter jurisdiction based on a federal question.[1] Because Plaintiff Ali El-Khalil has failed to present a prima facie case of FCA retaliation, DMC's motion is granted.

The remainder of the case involves state law claims over which the Court has supplemental jurisdiction. See First Amended Complaint (Dkt. 35) ("FAC"). A district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). The Court exercises that option here. All claims other than El-Khalil's action against the DMC for FCA retaliation are dismissed without prejudice,

---

[1] Docket entry 164 is a version of DMC's motion and brief filed under seal; other than redactions, it is identical to docket entry 154.

and the pending motions concerning those claims (Dkts. 153, 159, 194, 196) are denied without prejudice.

## I. BACKGROUND

**A. El-Khalil's FCA Reporting and Conflicts with Fellow Doctors**

El-Khalil is a podiatrist who had staff privileges at DMC beginning in 2008. El-Khalil Aff., Ex. 3 to Resp. to DMC MSJ, ¶ 2 (Dkt. 181-3); Credentials Committee Outlier Packet, Ex. 14 to DMC Mot., at 3 (Dkt. 164-2). Starting in or about late 2016, he began meeting with federal authorities to report what he believed were fraudulent billing practices in violation of the FCA by individuals including Defendants Mohammed Khalil and Nsima Usen, and former Defendants Mahmud Zamlut and Leonard Ellison, all of whom have or had staff privileges at DMC. El-Khalil Aff. ¶ 6.[2] El-Khalil has had conflicts with several of these doctors, most notably with Khalil. Id. ¶¶ 9-11.

The conflicts with Khalil include an incident outside a gas station on October 10, 2017. Id. ¶ 10; see also Gas Station Incident Video, Ex. 18 to Resp. to DMC MSJ (Dkt. 181-18). The video plainly shows that El-Khalil and Khalil antagonized one another and that each escalated the conflict, although only Khalil used or attempted to use physical force. Gas Station Incident Video. However, for purposes of this motion, the Court adopts El-Khalil's characterization of the incident, which is that Khalil assaulted him. El-Khalil also signed an affidavit describing an incident on November 30, 2017, in which Khalil verbally assaulted El-Khalil, and threatened to harm him physically, kill him, and harm his family. El-Khalil Aff. ¶ 11. The short video El-Khalil submitted

---

[2] Previous stipulated orders have dismissed claims against Zamlut (Dkt. 137) and Ellison (Dkt. 53).

of the incident in the hospital shows only that Khalil directed obscenities and insults toward El-Khalil, not threats. See Video of Khalil at Hospital, Ex. 52 to Resp. to DMC MSJ (Dkt. 181-52).

The details of El-Khalil's conflicts with Khalil and the other physicians he reported for billing fraud are by and large immaterial. Suffice to say that El-Khalil has submitted enough factual evidence to support a finding that individuals including Khalil, Usen, and Zamlut had motives to harm El-Khalil and his career. Whether they acted on those motives in a manner that inculpates DMC is another matter entirely.

### B. DMC's Credentialing Process

DMC has a centralized medical staff. DMC Bylaws, Ex. 1 to DMC MSJ, arts. I, VII (Dkt. 154-2). Applications for reappointment to the staff first go to the physician's clinical department for a recommendation, which is forwarded to a credentials committee. Id. art. IV. A credentials committee then makes a recommendation. Id. art. IV, art. VIII § 3.B.4. Next, the Medical Executive Committee ("MEC") makes its own recommendation. Id. art. VIII § 2.D.5. None of these recommendations is binding, as the Governing Body has the final word. Id. art. III § 4. Appointments are for a period not to exceed two years. Id. art. iv.

### C. El-Khalil's Application for Reappointment

From 2008 through 2016, El-Khalil's privileges were renewed every two years. El-Khalil Aff. ¶ 2. On December 5, 2016, El-Khalil was reappointed to DMC's medical staff through December 2, 2017. 2016 Reappointment Notice, Ex. 1 to El-Khalil Resp. to DMC MSJ (Dkt. 181-1). El-Khalil had previously been denied renewal of privileges at several hospitals in the Oakwood system, which, according to DMC credentials committee member Kurt Hesse, was a significant factor for the committee to consider, but not an automatic basis for disqualification. Hesse Dep.,

Ex. 40 to Resp. to DMC MSJ, at 32 (Dkt. 181-40).³ Hesse testified that this reappointment for one year rather than the customary two years represented a "kind of probationary year." Id. at 32. However, the 2016 reappointment notice said nothing about a probationary period. 2016 Reappointment Notice.

On June 17, 2017, El-Khalil applied for reappointment. 2017 Reappointment Application, Ex. 7 to DMC MSJ (Dkt. 164-1). El-Khalil included a cover sheet requesting his application not be reviewed by his competitors Usen and Khalil, citing "ongoing legal issues." Id. at 2.

DMC asserts that a committee within the podiatry department decided in summer 2017 to investigate complaints against El-Khalil and determined that it wanted to hear from El-Khalil. DMC Statement of Material Facts ¶ 9 (Dkts. 154, 164) ("DMC Facts"). Harry Kezelian, chief of the section of podiatry across DMC's system, testified that this committee within the podiatry department met in late summer or early fall of 2017. Kezelian Dep., Ex. 4 to Resp. to DMC MSJ at 20 (Dkt. 181-4).⁴ Contrary to DMC's assertion, DMC Facts ¶ 9, Kezelian's testimony does not establish that the committee was specifically formed to investigate complaints. See Kezelian Dep. at 20-22 (discussing the committee); see also Pl. Counterstatement of Material Facts ¶ 9 ("Pl. Facts") (Dkt. 180) (El-Khalil denying that the committee was formed to investigate complaints).

---

³ The Oakwood hospitals at which El-Khalil's privileges were denied include Oakwood Dearborn, Oakwood South-Shore, and Oakwood-Wayne. See Credentials Committee Outlier Packet at 2. Oakwood Dearborn would later become Beaumont Dearborn following the merger of the Beaumont and Oakwood systems. 1/8/18 Letter to Maddox, Ex. 4 to DMC MSJ (Dkt. 154-5); see also Beaumont History, https://perma.cc/YB98-RRUA. DMC is a separate hospital system whose facilities include Detroit Receiving Hospital, Sinai-Grace Hospital, Harper Hospital, Hutzel Women's Hospital, Huron Valley-Sinai Hospital, and Rehabilitation Institute of Michigan. See Credentials Committee Outlier Packet at 3.

⁴ Kezelian referred to this committee as a "credentialing committee," but he clarified that this was a credentialing committee within the podiatry department, not the DMC-wide credentials committee that reviews applications after the department has made its recommendation. See Kezelian Dep. at 43.

Kezelian testified that this committee, of which Usen was a member, planned to ask the Medical Affairs Committee to request that El-Khalil appear before the committee. Kezelian Dep. at 20-22. However, DMC has failed to produce any evidence that any such request was made, and El-Khalil has denied that Kezelian ever asked him to appear before any committee. See El-Khalil Dep., Ex. 5 to Resp. to DMC MSJ, at 118 (Dkt. 181-5).

On November 20, 2017, DMC Credentialing Specialist Deborah Freeman notified El-Khalil that his credentials were at risk of expiring on December 2, 2017, the expiration date set by his December 2016 re-appointment. Freeman 11/20/2017 Email, Ex. 11 to DMC MSJ (Dkt. 154-12). Freeman's email explained that although DMC had received El-Khalil's reappointment application, it had not received his case logs in a timely matter. Id.[5] The email also stated that Freeman or her colleagues had attempted to contact El-Khalil on numerous occasions, and that El-Khalil was required to submit the application and supporting documentation 90 days prior to the date his credentials were set to expire to allow sufficient time to complete the credentialing process. Id.

DMC ultimately received the case logs and has admitted for purposes of this motion that El-Khalil sent the logs on October 12, 2017. DMC Facts ¶ 6, n.1. This completed El-Khalil's application. DMC Facts ¶ 6.

According to DMC, El-Khalil's privileges lapsed on December 2, 2017, as El-Khalil was notified they would when he was reappointed in 2016. 2016 Reappointment Notice; see also El-Khalil Dep. at 94 (El-Khalil admitting that he had read the notice with its December 2, 2017 expiration date). El-Khalil has not directly contested DMC's claim that the privileges lapsed on

---

[5] "Case logs" are logs of procedures performed at other hospitals and were required as supporting documentation for El-Khalil's application for re-appointment at DMC. See DMC Facts ¶ 5; Pl. Facts ¶ 5.

December 2, 2017. Compare DMC Facts ¶ 11, n.2 (asserting that the privileges lapsed on December 2, 2017), with Pl. Facts ¶ 11 (silent on the issue).[6] The mere lapsing of credentials on December 2, 2017, rather than their suspension or revocation on a later date, may be deemed established. See Fed. R. Civ. P. 56(e)(2).

El-Khalil's application proceeded toward evaluation. According to DMC quality analyst Patricia Dotzenroth, El-Khalil's application would ordinarily be reviewed by Usen, chief of podiatry at El-Khalil's primary DMC hospital, and Bryan Little, specialist-in-chief of orthopedics, podiatry's parent department. Dotzenroth Dep., Ex. 13 to DMC MSJ, at 15 (Dkt. 154-14). However, based on Usen's request, she sent the application only to Little. Id.; see also Pl. Facts ¶ 7 (El-Khalil admitting these facts).

Nevertheless, Usen made some attempt to enter the process. On December 12, 2017, in response to an email concerning another individual's privileges, Usen wrote, "Please why did we sent [sic] El-khalil file directly to Dr. Little without section chiefs and our committee deliberating on it? We have so much complain [sic] about this doctor??" See December Emails Regarding Anonymous Doctor, Ex. 27 to Resp. to DMC MSJ (Dkt. 181-27). Dr. Little replied on December 27, inviting Usen to sit down and touch base with him regarding any issues in Usen's department,

---

[6] It is unclear when precisely El-Khalil lost the ability to see patients. Based on the Dotzenroth-Little emails discussed below, it would seem that the credentialing portal indicated that El-Khalil had some privileges as of January 19, but not as of January 26, despite the fact that the relevant committees had not yet acted on El-Khalil's application for reappointment.

In a section of his brief concerning an issue this Opinion does not reach—whether El-Khalil's claim is barred by release—El-Khalil contends that he lost the ability to see patients on January 22. Resp. to DMC MSJ at 26-27. However, in that portion of his brief, he does not deny that his privileges lapsed in early December. Id. Instead, he argues that any gap between the time his privileges lapsed and the time they were terminated (i.e. the time he lost the ability to see patients) is evidence of bad faith, rendering the release inoperative. Id. However, El-Khalil does not identify how these facts might bear on the elements of his prima facie FCA retaliation case, and the Court will not speculate how they might.

including with "the doctor mentioned below." Id. Usen responded on January 1, 2018, requesting that Little's secretary contact him to schedule a meeting. Id. Neither side has presented further evidence as to whether that meeting occurred or any evidence concerning the meeting's content.

Two relevant email exchanges occurred on December 14, 2017. The first consisted of a single email, sent by Freeman to El-Khalil in response to an email El-Khalil sent asking about the state of his privileges, and stating the following:

> Good morning Dr. El-khalil your privileges are in good standing and you can continue to see in- house patients and do in house consults and anything else as far as in-patient. [Y]ou will be receiving a letter within a month to let you know that you have been through the re-appointment process in good standing, and will be re-appointed in the next 2 years [sic]. . . .

Freeman December Email, Ex. 17 to DMC MSJ (Dkt. 154-18). This email was unauthorized, and according to DMC, inaccurate. See Freeman Dep., Ex. 10 to DMC MSJ, at 8-12 (Dkt. 154-11); Merity Dep., Ex. 3 to DMC MSJ, at 24 (Dkt. 154-4).

The other December 14 email exchange involved Little and Dotzenroth. Dotzenroth sent an email instructing Little to make his recommendations on the credentialing portal. 12/14/17 Dotzenroth-Little Emails, Ex. 18 to Resp. to DMC MSJ (Dkt. 154-17).[7] Little responded that he could not approve El-Khalil. Id. Dotzenroth responded asking if Little needed any documentation, stating that El-Khalil would lose privileges at the end of the day, and stating that Usen could not review the application due to the legal issues between Usen and El-Khalil. Id. Little responded by stating that he did not need any documentation from Dotzenroth, that El-Khalil had been making personal threats against another podiatrist, and that he was "[s]till trying to figure this one out." Id. Little and Dotzenroth exchanged a few more emails, culminating in Dotzenroth's

---

[7] The credentialing portal appears to be software used in the electronic review process. See Dotzenroth Dep. at 9. It allows the department chiefs and section chiefs to review applications. Id.

recommendation that Little speak with Dotzenroth's director, Mary Merity, about the possibility of placing El-Khalil on a behavior contract. Id.

On January 7, 2018, credentials committee member Aaron Maddox called El-Khalil seeking details about the Oakwood non-renewals. DMC Facts ¶ 12; Pl. Facts ¶ 12. El-Khalil's attorney Ben Gonek responded on January 8, 2018. 1/8/18 Letter to Maddox, Ex. 4 to DMC MSJ (Dkt. 154-5). Gonek presented his position that the Oakwood privileging decisions were motivated by illegal retaliation for El-Khalil's reports of healthcare fraud at Oakwood, pointed out that no complaints made against El-Khalil at Oakwood had to do with patient care, and expressed El-Khalil's concern that Khalil, Zamlut, and Mahir Elder might be attempting to interfere with the credentialing process at DMC. Id.

Meanwhile, El-Khalil's reappointment process remained up in the air. At meetings in December 2017 and January 2018, the credentials committee tabled El Khalil's application because it had not received a department recommendation. Hesse Dep. at 8-12. On January 18, 2018, Dotzenroth sent an email to Little stating that she needed "a little clarification as to Dr. El-Khalil. All of the privileges are approved yet Dr. Kezelian is saying he doesn't recommend him?" Dotzenroth-Little Emails, Ex. 21 to DMC MSJ (Dkt. 154-22). Little responded the next day with an email stating that he noticed the same thing, that he spoke with Kezelian, and that Kezelian and "the other podiatrist" did not want El-Khalil to have privileges. Id. Dotzenroth responded immediately with an email stating, "Are you in agreement. If so will have Dr. Kezelian go back into the Credentialing Portal and take out the privileges if he was the one who put them in. I can't tell at this point whether it was you or he?" Id.

One week later, on January 26, 2018, Little responded to that email and asked whether El-Khalil had privileges. Id. Dotzenroth responded the same day explaining that El-Khalil did not

have privileges and that he would go through the committee process as a denial, meaning that he would be reviewed by the credentials committee, the MEC, and the Board on various upcoming dates. Id.[8]

According to El-Khalil, he attempted to see patients on January 22, 2018, and was "informed by staff that [his] privileges had been suspended." El-Khalil Aff. ¶ 15. He has since admitted that he did not receive a "summary suspension," El-Khalil Dep. at 66.

On January 22, 2018, Gonek sent an email to Frances Fenelon, regional counsel for DMC's parent company. See Gonek-Fenelon Emails, Ex. 19 to DMC MSJ (Dkt. 154-20). Gonek told Fenelon that El-Khalil had been informed that day that his privileges had been suspended; stated his belief that the suspension was attributable to El-Khalil's cooperation with the federal government; and threatened to sue under the retaliation provision of the FCA. Id. Fenelon replied by stating that she was unaware of any action against El-Khalil, asking what made El-Khalil believe his privileges were being suspended, encouraging El-Khalil and Gonek to report fraud concerns "regardless of the privileging process," and requesting a courtesy copy if Gonek filed suit on El-Khalil's behalf. Id.

Neither side has presented much detail about the departmental review process, other than the fact that the department recommended against reappointing El-Khalil. On March 5, 2018, the credentials committee recommended denial of El-Khalil's application. March 2018 Credentials Committee Minutes, Ex. 22 to DMC MSJ (Dkt. 164-3). The adverse departmental recommendation weighed heavily in that decision. Hesse Dep. at 36. The credentials committee also had access to the Credentials Committee Outlier Packet See Credentials Committee Outlier

---

[8] The email states that El-Khalil would be reviewed by the credentials committee on the 5th, by the MEC on the 19th, and the Board on the 23rd, but it does not set out a specific month.

Packet. The packet contained numerous complaints against El-Khalil, including some anonymous or unattributed complaints, and at least one by Khalil. Id.

On March 19, 2018, the MEC unanimously voted to recommend that reappointment be denied, citing "unprofessional and very disruptive and aggressive behavior at Sinai-Grace Hospital." MEC March 19, 2018 Minutes, Ex. 23 to DMC MSJ, at 3-4 (Dkt. 164-4).

On March 20, 2018, former Defendant Anthony Tedeschi, DMC's CEO at the time, sent a letter notifying El-Khalil that the MEC had voted to deny El-Khalil's reappointment.[9] Notice of Adverse Decision and Right to Appeal, Ex. 41 to Resp. to DMC MSJ (Ex. 181-41) ("MEC 2018 Notice").

El-Khalil requested a "fair hearing" and prevailed, leading to a revised recommendation by the MEC to recommend reappointment. See March 22, 2019 MEC Recommendation, Ex. 30 to DMC MSJ (Dkt. 154-31). However, the Governing Body voted to deny the MEC's recommendation and to deny El-Khalil's reappointment, as discussed in a May 3, 2019 notice. See Governing Body Initial Decision, Ex. 32 to DMC MSJ (Dkt. 154-32). After an appeal, the Governing Body voted again to deny appointment, as discussed in a May 18, 2020 notice. Governing Body Final Decision, Ex. 35 to DMC MSJ (Dkt. 154-36).

## II. STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be

---

[9] Tedeschi was dismissed from the action by stipulated order on March 17, 2020 (Dkt. 108).

viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

### III. DISCUSSION

**A. FCA Retaliation**

El-Khalil claims the protection of the FCA's anti-retaliation provision, described in the statute as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h).

11

The McDonnell–Douglas burden-shifting framework applies to FCA retaliation claims. Scott v. Metro. Health Corp., 234 F. App'x 341, 346 (6th Cir. 2007). To establish a prima facie case of retaliation, El-Khalil must show that (i) he engaged in protected activity, (ii) DMC knew of this exercise of his protected rights, (iii) DMC took an employment action adverse to him, and (iv) there was a causal connection between the protected activity and the adverse action. Id.

If El-Khalil establishes a prima facie case of retaliation, a presumption of retaliation arises; DMC may rebut that presumption by asserting a legitimate, non-retaliatory reason for the adverse actions. Id. The burden then shifts back to El-Khalil to show by a preponderance of the evidence that DMC's stated lawful reason was a pretext for retaliation. Id. El-Khalil must then produce sufficient evidence from which a jury could reasonably reject DMC's explanation and infer that El-Khalil intentionally discriminated against him because of protected activity.

DMC does not deny that El-Khalil engaged in protected activity by reporting fraud to federal authorities. It is beyond dispute that DMC knew that he engaged in protected activities as of January 8, 2018, when El-Khalil's attorney Ben Gonek sent a letter informing DMC officials of his concerns that the DMC privileging decision could be affected by El-Khalil's problems at Beaumont Dearborn and his disputes with Khalil, Zamlut, and Elder. 1/8/18 Letter to Maddox.[10]

However, DMC is entitled to summary judgement based on the adverse action and causation elements, as El-Khalil has failed to present evidence creating a genuine factual dispute

---

[10] According to DMC, this letter was the earliest document informing DMC that El-Khalil had made accusations of healthcare fraud against it. DMC Facts ¶ 13. El-Khalil denied the contents of that paragraph of DMC's fact section. Pl. Facts ¶ 13. However, in that denial, El-Khalil only presents facts tending to rebut another statement in paragraph 13 of DMC's fact section, namely that the accusations described in the letter were against Oakwood providers, not DMC. El-Khalil's position as to whether DMC knew about El-Khalil's engagement in protected activity prior to January 8, 2018 is unclear.

as to either. Because El-Khalil has failed to establish a prima facie case of retaliation, no presumption of retaliation arises, and the question of pretext will not be considered.

### 1. Adverse Employment Action

DMC argues that El-Khalil cannot meet the adverse employment action element. See DMC MSJ at 11-15. This argument has two parts. First, DMC argues that only events referred to and predating the operative complaint, filed in November 2018, should be considered when evaluating whether El-Khalil experienced an "adverse action" within the meaning of the FCA anti-retaliation provision. Id.; see also FAC. Second, DMC argues that El-Khalil has failed to create a genuine fact question as to whether he suffered an adverse action based on pre-complaint events.

El-Khalil fails to respond effectively. As explained below, he seeks to satisfy the "adverse action" element with an event that does not qualify as one under the statute. Then he points to events that might qualify as such, but these events cannot be considered because they were never made part of this action.

As to the first point, El-Khalil's position has evolved since the filing of his complaint. The FAC states that El-Khalil was "suspended," "revoked/not renewed," or "terminated" in January 2018. However, he has abandoned the position that the adverse action occurred in January 2018, by failing to contest DMC's assertions and evidence that his credentials lapsed in December 2017 and that he did not receive a suspension in January 2018. See Pl. Facts ¶¶ 11, 15. Instead, in his summary judgment response, El-Khalil contends that the adverse action took place in March 2018, when the MEC recommended that his privileges not be renewed. Resp. to DMC MSJ at 22-23.

However, El-Khalil's reliance on the MEC 2018 recommendation is fatal, because it cannot meet the definition of an adverse action. DMC argues that the MEC's March 2018 recommendation is insufficient to support a retaliation claim because it was "merely advisory" and

13

subject to several layers of review. DMC MSJ at 14. It argues that such an advisory recommendation, subject to a fair hearing process, is not akin to the adverse actions enumerated in the statute. Id. (citing 31 U.S.C. § 3730(h)). The thrust of DMC's argument is correct.

An action must cause some tangible harm to qualify as an adverse action under § 3730(h). See Scott v. Metro. Health Corp., 234 F. App'x at 348. It is difficult to see how the MEC's 2018 recommendation caused any tangible harm, and El-Khalil fails to articulate any. El-Khalil's privileges had already lapsed, the podiatry department had already recommended against renewal, the recommendation itself was subject to a fair hearing, and the recommendation did not bind the Governing Body.

El-Khalil fails to respond to the substance of DMC's argument or advance any explanation of the tangible harm attributable to the MEC's 2018 recommendation. Concerning the adverse action requirement, El-Khalil writes only, "[i]t is also clear that Defendant [sic] was retaliated against by Defendant DMC by their failure to renew his medical staff privileges." Resp. to DMC MSJ at 22-23 (citing the MEC 2018 Notice). The only thing that is "clear" is that Khalil's argument is merely conclusory. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." McPherson v. Kelsey, 125 F.3d 989, 995-996 (6th Cir. 1997) (internal citation and marks omitted)). Thus, El-Khalil has waived any argument that the MEC's recommendation constitutes an adverse action—even if the unrebutted evidence did not show (which it does) that the MEC recommendation does not qualify as an adverse action.

El-Khalil's second misguided effort is his discussion of events post-dating the filing of the FAC. The Governing Body voted to deny El-Khalil privileges in 2019, and it rejected his appeal

in 2020. These decisions might well constitute adverse actions, but they occurred outside the scope of the complaint. El-Khalil does not counter DMC's argument that El-Khalil must satisfy the "adverse action" element with an event occurring prior to the filing of the FAC. Instead, he states that he is going to seek to amend his complaint, but that he "certainly has a valid claim that will only get better if this Court allows him to amend his complaint to include the post complaint activities of DMC." Resp. to DMC MSJ at 20.

El-Khalil might well have invoked Rule 15(d) of the Federal Rules of Civil Procedure to supplement his complaint and include events that post-dated the filing of his complaint. That rule allows a court "[o]n motion and reasonable notice . . . [to] permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). The rule "is designed to permit expansion of the scope of existing litigation to include events that occur after the filing of the original complaint." Keith v. Volpe, 858 F.2d 467, 471 (9th Cir. 1988); see also Weisbord v. Michigan State Univ., 495 F. Supp. 1347, 1350–1351 (W.D. Mich. 1980) ("The purpose of a supplemental pleading is to set forth new facts that have occurred since the filing of the original pleading and that affect the controversy and the relief sought. Its function is to bring the action 'up to date.'").

Inexplicably, El-Khalil has not filed any such motion. In fact, he has not even made an express request to supplement his complaint in his summary judgment response. He states that his claim "will only get better if the court allows him to amend to include post complaint activities," but El-Khalil never actually asks the Court in the response to allow him to do so. And even if he had expressly made a request to amend (or more properly, to supplement) in his summary judgment response, his effort would have collided with authority that rejects efforts to seek amendment by way of a summary judgment response instead of filing a formal motion. See Desparois v.

15

Perrysburg Exempted Vill. Sch. Dist., 455 F. App'x 659, 666 (6th Cir. 2012). Therefore, for purposes of evaluating the adverse action element, the Court has not considered events occurring after the filing of the FAC.

In sum, El-Khalil's case fails because he has not raised a triable issue that he experienced an adverse action during the time period covered by the complaint.

### 2. Causation

Even if the March 2018 MEC decision were treated as an adverse action, DMC would be entitled to summary judgment because El-Khalil has not offered sufficient evidence of a causal connection between the protected activity and the adverse action. He attempts to do so by arguing that Usen and Zamlut were improperly involved in the decision-making process and by presenting the fair hearing panel's report. However, he does not present sufficient evidence to forestall summary judgment.

#### a. Usen's Involvement

El-Khalil argues that "[p]robably the most significant evidence [of retaliation] is Defendant Usen participating in the credentialing of Plaintiff." Resp. to DMC MSJ at 23. He claims that Usen participated in the podiatry department's decision to recommend that El-Khalil's credentials be denied even after Dotzenroth informed Little that Usen could not participate in El-Khalil's credentialing. Id. And he argues that Usen's participation was significant, because the credentials committee relied heavily on the podiatry department's recommendation when making its own recommendation. Id.

The argument appears to be that if an individual El-Khalil accused of health care fraud was in any way involved in the process leading to the MEC's recommendation, the MEC and DMC could be deemed to have adopted the motive of its conflicted agent. This argument is neither

16

clearly spelled out nor entirely convincing, but it fails to get off the ground because El-Khalil has presented no evidence that Usen played any meaningful role in the decision-making process.

In the argument section of his brief, El-Khalil does not support this argument with citations to the record. See Resp. to DMC MSJ at 23. The related factual allegations and the evidence supporting those allegations do not support his claim that Usen was meaningfully involved in the departmental process after Dotzenroth informed Little that Usen could not be involved. In his fact section, El-Khalil writes that the credentials committee's "decision weighed heavily based on the Podiatry Department's recommendation in which Defendant Usen Participated. (Exhibit 4, pg. 21; Exhibit 40, Hesse Depositions, pgs. 36, 69, 70.)" Pl. Facts ¶ 60. The referenced portion of exhibit 4 to El-Khalil's response shows that, according to Kezelian, Usen was part of a credentialing committee that met in "mid-late summer of 2017." Kezelian Dep. at 21-22. Nothing in Kezelian's testimony states that Usen was part of the departmental decision-making process between the time Dotzenroth circulated the application in late 2017 and the fair hearing. See generally id.; see also Fair Hrg. Tr., Ex. 6 to Resp. to DMC MSJ, at 201-203, 208-214 (Dkt. 181-6) (Kezelian describing Usen as the chair of the podiatry credentialing committee, but not describing any meeting other than one occurring in summer 2017).

The reference to pages 36, 69, and 70 of Hesse's deposition is garbled, as exhibit 40 to El-Khalil's response contains only 37 pages. See Hesse Dep. Hesse's testimony on page 36 supports the claim that the department's recommendation weighed heavily in the credentials committee's decision to recommend that El-Khalil not be reappointed. Id. at 36. The Court assumes that El-Khalil intended to reference pages 69 and 70 of exhibit 6, containing similar testimony by Hesse during El-Khalil's fair hearing. See Fair Hrg. Tr. at 69-70. This testimony confirms Hesse's

position that the credentials committee relied on the department's recommendation that El-Khalil be denied credentials, but it says nothing about Usen's role in the departmental process.

El-Khalil also attempts to show Usen's involvement based on the emails between Little and Usen in December 2017 and January 2018. El-Khalil frames this planned meeting as inconsistent with Dotzenroth's instruction that Usen should not have anything to do with El-Khalil's credentialing, Pl. Facts ¶ 49, but he provides no further evidence that the meeting occurred and no evidence of what transpired during or as a result of the meeting. Reaching the conclusion that Usen played any meaningful role in the departmental recommendation process based on these emails would require more than drawing reasonable inferences in El-Khalil's favor; it would require guesswork and conjecture beyond the facts presented.

Even drawing all reasonable inferences in El-Khalil's favor, the Court cannot conclude that Usen improperly participated in the departmental recommendation that El-Khalil's credentials be denied simply because Usen and Little may have met.

In sum, El-Khalil has not provided evidence that Usen participated in the departmental recommendation to the credentials committee that El-Khalil's credential be denied. His "most significant evidence" is no evidence at all.

      **b. Zamlut's Involvement**

Next, El-Khalil argues that the fact that Zamlut was initially appointed to the fair hearing panel, before being disqualified the next day at El-Khalil's request, "is just further evidence of Defendant DMC's intent to retaliate against Plaintiff." Resp. at 23. This is nonsense. The MEC 2018 Notice invited El-Khalil to request disqualifications, and his request to disqualify Zamlut was implemented immediately. See Emails re: Hearing Dates, Ex. 26 to DMC MSJ, at 4 (Dkt. 154-27) This process is no different than the one courts use, under which judges are assigned to

cases and subject to later disqualification. See, e.g., E.D. Mich. LR 83.11. Evidence that a similar system successfully led to Zamlut's disqualification does nothing to show bias.

### c. The Fair Hearing Panel

Following El-Khalil's arguments about causation, he transitions to arguing that DMC's reasons for failing to renew his privileges were pretextual. See Resp. to DMC MSJ at 23-25. His leading argument in that portion of the brief is that the fair hearing panel's conclusion that the decision not to reappoint him was "incorrect, not justified, unreasonable, arbitrary, [and] not substantiated by the evidence." Fair Hrg. Panel Conclusion and Recommendation, Ex. 44 to Resp. to DMC MSJ, at 5 (Dkt. 181-44) ("Fair Hearing Report"). This finding might also be seen as supporting his argument on causation and evaluated as such. However, El-Khalil gains no traction from that revised focus. Even assuming the hearing panel was correct that the MEC's decision was incorrect, not justified, unreasonable, arbitrary, and unsubstantiated by the evidence, that does not mean it was motivated by retaliatory animus. Intra-hospital disagreements about credentialing, without more, do not add up to unlawful retaliation. The fair hearing report says nothing about FCA retaliation by DMC and fails to help El-Khalil meet his burden of producing evidence sufficient to support a prima facie case of FCA retaliation. Id.[11]

El-Khalil has failed to present a prima facie case of FCA retaliation because he has failed to show that the MEC's decision was an adverse action, and because he has not put forward any

---

[11] The fair hearing report did dismiss some evidence presented to it because of conflicts of interest involving individuals who may have been motivated to retaliate again El-Khalil. In particular, the panel downplayed El-Khalil's denial of credentials at Oakwood in light of evidence that decisionmakers at Oakwood included individuals who were convicted of fraud based on El-Khalil's whistleblowing there. Fair Hearing Report at 4. And it found "conflicts of interest in the letters of complaint submitted by the MEC." Id. But these evidentiary findings do nothing to establish, affirmatively, a causal connection between El-Khalil's protected activity and adverse action by DMC.

evidence of a causal connection between the protected activity and the MEC decision. Therefore, the Court need not analyze whether DMC's actions were pretextual. Furthermore, the Court will not consider DMC's arguments that El-Khalil's claim is barred by release and his alleged violation of his obligation to maintain the confidentiality of his fair hearing, or that statutory immunity would preclude El-Khalil obtaining damages. See DMC MSJ at 21-25. DMC is entitled to summary judgment regardless.

### B. State Law Claims

Plaintiff El-Khalil has asserted a number of state law claims at Defendants, and Counter-Plaintiff Khalil has asserted a state law counterclaim against El-Khalil. Because the dismissal of the one federal claim means that this case no longer retains a federal character, the Court dismisses these state law claims without prejudice and denies the motions challenging the state law claims without prejudice. See 28 U.S.C. § 1367(c)(3); see also Gohl v. Livonia Pub. Sch., 134 F. Supp. 3d 1066, 1069 (E.D. Mich. 2015), aff'd., 836 F.3d 672 (6th Cir. 2016)

### IV. CONCLUSION

DMC's motion (Dkts. 154, 164) is granted, and DMC is awarded summary judgment with respect to the FCA retaliation claim against it. All other claims are dismissed without prejudice, and the balance of the motions (Dkts. 153, 159, 194, 196) are denied without prejudice.

SO ORDERED

Dated: January 14, 2021  s/Mark A. Goldsmith
  Detroit, Michigan  MARK A. GOLDSMITH
  United States District Judge