# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: October 07, 2021

Mr. Mohammed Abdrabboh
Law Office
1360 Porter Street
Dearborn, MI 48124

Mr. Kassem M. Dakhlallah
Hammoud, Dakhlallah & Associates
6050 Greenfield Road, Suite 201
Dearborn, MI 48126-4234

Mr. Roger P. Meyers
Bush, Seyferth
100 W. Big Beaver Road, Suite 400
Troy, MI 48084

      Re: Case No. 21-1140, *Ali El-Khalil v. Nsima Usen, et al*
        Originating Case No. : 2:18-cv-12759

Dear Counsel,

  The Court issued the enclosed opinion today in this case.

            Sincerely yours,

            s/Cathryn Lovely
            Opinions Deputy

cc: Ms. Kinikia D. Essix

Enclosure

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0457n.06

No. 21-1140

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |
|---|---|
| ALI EL-KHALIL, D.P.M. <br><br> Plaintiff-Appellant, <br><br> v. <br><br> NSIMA USEN; MOHAMMED KHALIL; DETROIT MEDICAL CENTER, a Domestic Not for Profit Corporation, <br><br> Defendants-Appellees. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

**FILED**
Oct 07, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: ROGERS, GRIFFIN, and THAPAR, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Ali El-Khalil worked at several healthcare facilities in southeast Michigan, including the defendant Detroit Medical Center ("DMC"). In 2016, he began reporting allegedly fraudulent billing practices to federal authorities. After his staff privileges at the DMC lapsed, El-Khalil sued the DMC and others, alleging unlawful retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h). The district court granted DMC's motion for summary judgment, ruling that El-Khalil failed to establish a prima facie case of retaliation. We agree and affirm.

I.

El-Khalil is a licensed podiatrist who, beginning in 2008, had staff privileges at the DMC. In 2016, he began meeting with federal authorities to disclose what he believed were fraudulent

No. 21-1140, *El-Khalil v. Usen, et al.*

billing practices by several doctors, including defendants Dr. Nsima Usen and Dr. Mohammed Khalil. El-Khalil also had personal conflicts with some of these individuals.

The DMC operates a centralized medical staff. After an applicant applies for staff privileges or reappointment, several bodies, including the applicant's clinical department, the credentials committee, and the Medical Executive Committee ("MEC"), evaluate the applicant and make a recommendation. The DMC's Governing Body makes the final decision to approve or deny all applicants. Between 2008 and 2016, the DMC renewed El-Khalil's staff privileges every two years. In December 2016, the DMC renewed El-Khalil's privileges again, but this time for only one year.

El-Khalil applied for reappointment in 2017, but he requested that his application not be reviewed by Drs. Usen and Khalil as a result of "ongoing legal issues." On December 2, 2017, El-Khalil's privileges officially lapsed per the 2016 reappointment notice. But despite the lapse, a miscommunication within the credentialing process allowed El-Khalil to continue to see patients. On December 14, 2017, DMC Credentialing Specialist Deborah Freeman sent El-Khalil an e-mail informing him that his privileges were "in good standing" and that he would receive a letter shortly telling him that he would "be reappointed in the next 2 years [sic]. . . ." Freeman had sent this e-mail because she was erroneously informed that El-Khalil's privileges had been approved. The DMC had not authorized this correspondence.

Instead, El-Khalil's official reappointment process remained up in the air. El-Khalil's application was initially reviewed by Bryan Little, specialist-in-chief of orthopedics (podiatry's parent department) and DMC quality analyst Patricia Dotzenroth. Per El-Khalil's request, his application was not sent to Dr. Usen. In an e-mail sent by Little to Dotzenroth on December 14, 2017, Little stated that he could "not approve El-Khalil at this moment" because he had "been

-2-

making personal threats against another podiatrist." In January 2018, Dr. Harry Kezelian, the chief of podiatry across the DMC system, recommended that El-Khalil's privileges not be renewed. On January 18, 2018, Dotzenroth asked Little why El-Khalil still had staff privileges even though he had not been recommended by Dr. Kezelian; Little responded, saying that Dr. Kezelian and "the other podiatrist [sic] don't want him to have privileges." A week later, Little confirmed that El-Khalil did not have privileges and, therefore, he would "go back through the Committee process as a denial. . . ." According to El-Khalil, he was informed on January 22, 2018, that he no longer had staff privileges.

On March 5, 2018, the Credentials Committee recommended a denial of El-Khalil's application "based on the pattern of behavior unacceptable for membership at the DMC." This decision was based not only on the adverse department recommendation, but also on other complaints about El-Khalil's behavior that the committee had received. On March 19, 2018, the MEC voted unanimously to recommend against reappointment. The next day, Anthony Tedeschi, then-CEO of the DMC, sent El-Khalil a letter informing him of the decision. He also informed El-Khalil that he could appeal that decision within 30 days and that, if he did not, the recommendation "will then be transmitted to the Governing Body of the DMC for final action."

Following the adverse recommendation, El-Khalil requested a hearing, which took place on December 17, 2018, and February 12, 2019. The panel concluded that the MEC recommendation was "incorrect, not justified, unreasonable, arbitrary, [and] not substantiated by the evidence." In response, the MEC reversed its prior recommendation. The DMC's Governing Body, however, declined to adopt the MEC's revised recommendation; it instead denied the application for reappointment. After El-Khalil appealed that decision, the Governing Body again denied reappointment, citing the "risk of continued negative behavior and lack of professionalism"

Case 2:18-cv-12755-MAG-APP ECF No. 247, PageID.4747 Filed 10/07/21 Page 5 of 12
Case: 21-1140 Document: 22-2 Filed: 07/21/2021 Page: 5 (5 of 12)

No. 21-1140, *El-Khalil v. Usen, et al.*

as well as a "persistent difficulty in resolving conflict and getting along with others." The May 18, 2019, letter to El-Khalil informing him of this decision stated that this was "now a final decision" as "[a]ll prior recommendations are advisory only."

El-Khalil filed this lawsuit in September 2018, prior to the Governing Body's final decision not to renew his privileges. His first amended complaint ("FAC") alleged that his privileges at the DMC had not been renewed "in retaliation for [El-Khalil] reporting the suspected health care fraud" perpetrated by the DMC and the named defendants, including Drs. Usen and Khalil. But because the FAC was filed before the Governing Body's final decision, he alleged that the suspension of his privileges in January 2018, and subsequent non-renewal, were the basis for the action. El-Khalil never moved to file a supplemental or another amended complaint.

The DMC moved for summary judgment under Fed. R. Civ. P. 56(a). The district court granted the motion, concluding that there no was no factual dispute as to whether El-Khalil suffered an adverse employment action or whether the non-renewal was caused by retaliation. El-Khalil now appeals.[1]

II.

We review de novo a district court's grant of summary judgment. *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 480 (6th Cir. 2017). Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a). "'To prevail, the nonmovant must show sufficient evidence to create a genuine issue of material fact,' which is to say, '[t]here must be evidence on which the

---

[1] The district court's order also dismissed El-Khalil's claims against Drs. Usen and Khalil without prejudice. Though El-Khalil filed a notice of appeal with respect to that judgment, he has since abandoned his arguments against Drs. Usen and Khalil on appeal.

-4-

jury could reasonably find for the [nonmovant].'" *Sumpter*, 868 F.3d at 480 (quoting *Napier v. Madison Cnty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001)) (alterations in original).

### III.

El-Khalil claims the DMC retaliated against him as prohibited by the FCA:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). "Retaliatory discharge claims under the FCA proceed under the same rules applicable to other employment-related retaliation claims." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 397–98 (6th Cir. 2015). "The plaintiff may establish a case of retaliation by presenting either direct or circumstantial evidence of a retaliatory motive." *Id*. at 398.

When, as here, there is no direct evidence of retaliation, the burden-shifting framework described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), applies. *Id*.; *see also Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 175 & n.3 (5th Cir. 2016). The plaintiff has the initial burden to demonstrate a prima facie case of retaliation. *See Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). Under the *McDonnell Douglas* framework, the plaintiff must establish "(1) he engaged in protected activity . . .; (2) [the defendant] knew about his exercise of the protected activity; (3) [the defendant] thereafter took adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action." *Id*. at 491–92; *see also Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). "If [the plaintiff] establishes a *prima facie* case, the burden

of production shifts to [the defendant] to 'articulate some legitimate, nondiscriminatory reason for [its adverse action].'" *Spengler*, 615 F.3d at 492 (quoting *McDonnell Douglas*, 411 U.S. at 802). "If [the defendant] succeeds in doing so, then the burden shifts back to [the plaintiff] to demonstrate that [the defendant's] 'proffered reason was not the true reason for the employment decision.'" *Id.* (quoting *Tuttle v Metro. Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007)).

A.

The issue here is whether El-Khalil has established a prima facie case of retaliation. There is no dispute that El-Khalil engaged in protected activities by reporting fraud or that the DMC knew El-Khalil was doing so. Thus, El-Khalil must establish that an adverse employment action occurred and that his protected activity caused that action. But before we turn to the merits, we must define the scope of El-Khalil's FCA retaliation claim.

As described, El-Khalil filed his FAC *after* his staff privileges lapsed and the MEC issued its initial recommendation but *before* the hearing, the MEC's revised recommendation, and the Governing Body's ultimate decision. Because of this, the FAC claimed only that "[d]uring mid-January of 2018, [El-Khalil] learned that his privileges were suspended, and he subsequently learned that his privileges would not be renewed." This clearly notifies the DMC and other defendants that his claim is predicated on the lapsing of privileges in January 2018, as well as the MEC's adverse recommendation in March 2018. It does not refer to any of the other events because they had not yet occurred. In determining whether El-Khalil established an adverse employment action, the district court declined to consider those events that occurred after the FAC, noting that, despite overtures that he would file a motion to amend or supplement his complaint, he had "[i]nexplicably" failed to do so. El-Khalil claims that this failure is of no moment, as the

district court should have considered all facts in the record, even if they arose outside the pleadings. We disagree.

In the absence of a supplemental pleading under Fed. R. Civ. P 15(d), El-Khalil cannot predicate his allegations on events occurring after the FAC. A supplemental pleading under Rule 15(d) allows a party to "[set] out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." The rule "is designed to permit expansion of the scope of existing litigation to include events that occur after the filing of the original complaint." *Keith v. Volpe*, 858 F.2d 467, 471 (9th Cir. 1988). In other words, its purpose is to bring the case "up to date" by "set[ting] forth new facts that have occurred since the filing of the original pleading and that affect the controversy and the relief sought." *Weisbord v. Mich. State Univ.*, 495 F. Supp. 1347, 1351 (W.D. Mich. 1980). A supplement may set forth new facts, new parties, and even, in some circumstances, new claims. 6A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1504 (3d ed. April 2021 Update). "The filing of an action fixes the controversy, and after-occurring events cannot be litigated except by the filing of a supplemental pleading with the court's consent." 4 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1051 n.20 (4th ed. April 2021 Update); *see also Rodgers v. Hawley*, 14 F. App'x 403, 408 (6th Cir. 2001) ("[The plaintiff] never filed a supplemental pleading alleging [the defendant's] failure to timely deliver his legal mail. This allegation was thus never before the district court.").

El-Khalil's failure to file a supplemental pleading leads us to conclude that those events that occurred after he filed the FAC are not properly part of this action. While it is true, as El-Khalil contends, that the district court should consider all record evidence, *see, e.g., Smith v. Hudson*, 600 F.2d 60, 64–65 (6th Cir. 1979), that does not extend to acts that occurred after the FAC and were never made part of the allegations for relief, *see Rodgers*, 14 F. App'x at 408. The

closest El-Khalil came to moving for such a supplemental pleading was in his response to the DMC's motion for summary judgment—but there, he stated only that his claim would "get better *if* this Court allows him to amend his complaint to include the post complaint activities of DMC." This is not an actual request (as the district court recognized), and the court did not err in declining to act on it. *See, e.g., Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000) ("What plaintiffs may have stated, almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is also not a motion to amend."). If El-Khalil wanted his FCA claim to include the post-FAC events, he needed to file a supplemental pleading. But he did not. Therefore, the district court did not err in limiting its "adverse employment action" review. We do so as well.

B.

An adverse employment action has been defined as a "materially adverse change in the terms and conditions of [a plaintiff's] employment." *White v. Burlington N. & Santa Fe Ry. Comm'n*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc) (citation omitted). Such an action must be a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 798 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). We have further observed:

> A tangible employment action in most cases inflicts direct economic harm . . . . Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors.

No. 21-1140, *El-Khalil v. Usen, et al.*

*Id.* (quoting *Ellerth*, 524 U.S. at 762). "[T]angible harm" is required because "actions that are not implemented are not adverse employment actions." *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 348 (6th Cir. 2007) (citing *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004)).

As noted above, there are two possible events that the FAC contemplates as possibly being an adverse employment action: the January 2018 lapse in privileges and the March 2018 MEC recommendation. Regarding the former, the district court concluded that El-Khalil had abandoned that theory prior to summary judgment. The DMC argued in its motion for summary judgment that neither event constituted an adverse action. But in El-Khalil's response to the DMC's motion, he responded by citing only the MEC's adverse recommendation in March 2018 and arguing that retaliation occurred when it "fail[ed] to renew his medical privileges." "[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). On appeal, El-Khalil fails to put forward a cogent argument explaining why the district court's conclusion was in error. On one hand, he contends it erred because "[t]he precise timing of the adverse action is a genuine issue of material fact;" on the other, he acknowledges that the "DMC's adverse action as of filing the FAC is the MEC's 2018 Recommendation." Given El-Khalil's failure to discuss the January 2018 lapse in his response to the DMC's motion for summary judgment and his apparent concession that the March 2018 recommendation is the adverse employment action referred to in the FAC, we discern no error in the district court's conclusion that El-Khalil abandoned the argument.[2]

---

[2] Regardless, even if the district court incorrectly concluded that El-Khalil had abandoned the argument, we are not persuaded that, in this context, the mere lapsing of El-Khalil's staff privileges was an adverse action. The 2016 reappointment provided El-Khalil notice of the date when his privileges would end without any further action taken by the DMC. When those privileges lapsed, the DMC did nothing, i.e., it took no "official act," to deprive El-Khalil of his

-9-

That leaves the March 2018 MEC recommendation. However, this recommendation is not an "adverse employment action." An adverse action must be a "significant change in employment status." *White*, 364 F.3d at 798 (quoting *Ellerth*, 524 U.S. at 761). But there was no change in El-Khalil's status before and after the recommendation—he was not hired, fired, reassigned, or anything of that sort. He had staff privileges at the DMC neither before nor after the recommendation was made. Further, as the district court recognized, the MEC recommendation was advisory only. An adverse employment action "requires an official act of the enterprise, a company act." *Id.* (quoting *Ellerth*, 524 U.S. at 762). But the MEC decision was not a decision of the DMC. Only the DMC's Governing Body can make a final decision on staffing, as the bylaws explain. The letter informing El-Khalil of the MEC recommendation reinforces this conclusion. It told him that the failure to appeal the decision would result in the recommendation being "transmitted to the Governing Body of the DMC for *final action*." In short, the MEC had no ability by itself to make official decisions for the DMC, and its recommendation did not result in any tangible, material change in El-Khalil's employment status. Therefore, El-Khalil did not establish a genuine issue of material fact regarding whether an adverse employment action existed. For this reason, he did not establish a prima facie case of retaliation, and the DMC was entitled to summary judgment in its favor.[3]

---

privileges. *See White,* 364 F.3d at 798. The summary expiration of an appointment, by the terms of that appointment, does not rise to the level of a discharge or a similar "significant change in employment status." *Id.* (quoting *Ellerth*, 524 U.S. at 761). S*ee also Squyres v. Heico Cos., L.L.C.*, 782 F.3d 224, 239–40 (5th Cir. 2015) (Jones, J., concurring) ("When the employment agreement terminated [by its own terms], [the plaintiff] did not suffer a material adverse employment action, *i.e.* a discharge."). It is far more akin to situations where the company does nothing to implement an adverse action. *See Scott*, 234 F. App'x at 348 (citing *Mitchell*, 389 F.3d at 182).

[3] Because we agree with the district court that El-Khalil failed to show a genuine issue of fact regarding an adverse employment action, we decline to address its alternative conclusion regarding causation as doing so is unnecessary to our disposition of the case.

IV.

For these reasons, we affirm the judgment of the district court.

-11-